UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MILWAUKEE COUNTY, et al.,

    Plaintiffs,

v.    Case No. 06-CV-0372

MERCER HUMAN RESOURCE
CONSULTING, INC.,

    Defendant.

---

**MERCER'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY
OF ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGED INFORMATION
INVOLVING MERCER EMPLOYEE DENNIS SKELLY
BECAUSE HE HAS BEEN DISCLOSED AS A TESTIFYING EXPERT**

---

## INTRODUCTION

The issues framed by Plaintiffs' motion to compel discovery are issues of first impression in this district and issues on which federal district courts nationwide have taken divergent approaches:

- Is an employee of a defendant who is not retained or specially employed to provide expert testimony, and whose duties as the defendant's employee do not regularly involve giving expert testimony, required to produce an expert report under Fed.R.Civ.P. 26(a)(2)(B)?

- Is such an employee-expert required to produce an expert report under the Eastern District of Wisconsin's Local Rule 26.1(a), which requires disclosure of the "substance of all expert witness evidence… of hybrid fact/expert witnesses such as treating physicians"?

- Whether or not such an employee-expert is required to produce an expert report, if he does so, does the defendant thereby waive its attorney-client or work product privileges for communications between its counsel and the employee-expert related to the subject matters of his report?

QBACTIVE\6160274.1

- How are these issues affected, if at all, when the employee-expert in question is a professional whose own conduct is challenged by the plaintiffs' allegations of malpractice against the defendant?

Dennis Skelly is a Mercer employee who served as the lead actuary for Milwaukee County and its Employee's Retirement System until December 2005. As the County itself states in its motion papers, Mr. Skelly's "own work in 2000-2001 is the subject of Plaintiffs' claims."[1] Mercer contends that Mr. Skelly, as a professional, should be permitted to defend himself against the allegations the County has made in this lawsuit, including offering opinions interpreting historical facts and data known to him, responding to criticisms of his conduct advanced by Plaintiffs' experts, responding to "damage" models created by Plaintiffs' experts, and testifying regarding the standard of care applicable to his own conduct as an actuary during the relevant period, all *without* being required to submit an expert report at all. In this, Mr. Skelly should be treated no differently than a doctor or lawyer who *himself* is charged with malpractice – as distinguished from the third-party treating physician envisioned by L.R. 26.1(a) – in either case, the defendant should be entitled to defend himself fully, including working closely with trial counsel on that defense, and testifying on his own behalf.[2] Mercer is unaware of any case anywhere that has held that a professional defending his own conduct in a malpractice case is required to submit an expert report under Rule 26(a)(2) of the Federal Rules of Civil Procedure.

Nevertheless, in an abundance of caution, Mercer produced a short expert report for Mr. Skelly focusing on two discrete issues: (1) responding to opinions in the reports by Plaintiffs' expert, Kim Nicholl, which relied on calculations utilizing a specialized actuarial software program known as "Pro Val"; and (2) refuting the County's repeated, unsupported claims that

---

[1] *See* Brief in Support of Plaintiffs' Motion to Compel Discovery of Documents Reviewed by Skelly Because He Has Been Named a Testifying Expert" ("Pls.' Brief"), p. 5.
[2] Indeed, Mr. Skelly has been Mercer's main client contact throughout this litigation, as Plaintiffs well understand. *See, e.g.,* Pls.' Brief, p. 1 (noting that Skelly is "an important fact witness and attended many depositions in the case, including all depositions of Plaintiffs' experts, as Mercer's company representative").

- 2 -

enactment of the BackDROP in 2001 caused a "dramatic shift" toward earlier retirements among County employees. Mercer has also produced thousands of pages of spreadsheets and other calculations supporting Mr. Skelly's two opinions.[3] Finally, Mercer produced Mr. Skelly for a deposition on March 11, 2008. In taking these actions, Mercer contends that it has already provided *more* disclosure than is required by the Federal Rules of Civil Procedure, not less. *See GSI Group, Inc. v. Sukup Mfg. Co.,* 2007 WL 853959, *2, n. 2 (C.D.Ill.)("The Court notes that GSI has actually given Sukup more than the Rules require by providing expert reports from these [employee-experts].").

Plaintiffs' motion to compel discovery of all privileged communications between Mr. Skelly and Mercer's counsel regarding the subject matters of his report raises important issues. What is most perhaps most noteworthy about Plaintiffs' motion, however, is that, while blithely asking the Court to allow a wholesale invasion of Mercer's attorney-client and work product privileges, Plaintiffs fail to cite *any* authority in the Eastern District of Wisconsin or the Seventh Circuit allowing such discovery, and misconstrue the cases from other jurisdictions they do cite.

For the reasons set forth below, this Court should deny Plaintiffs' motion to compel the production of privileged communications between Mr. Skelly and Mercer's counsel.

## PERTINENT FACTUAL BACKGROUND

**1.    The Origins of Skelly's Two Expert Opinions**

As stated above, Mr. Skelly's expert report offered opinions on two very narrow issues: (1) responding to opinions in the reports by Plaintiffs' expert, Kim Nicholl, which relied on calculations utilizing a specialized actuarial software program known as "Pro Val"; and (2) refuting the County's repeated, unsupported claims that enactment of the BackDROP in 2001 caused a "dramatic shift" toward earlier retirements among County employees. Mr. Skelly

---

[3] *See* Declaration of Joshua Maggard ("Maggard Decl."), ¶ 2.

testified in his recent expert deposition that he was only asked to prepare an expert report in this matter in early February 2008, just before Mercer's expert disclosures were due.[4] Because the timing of the decision to ask Mr. Skelly for an expert report on these two issues may be important to the Court's ultimate ruling on Plaintiffs' motion to compel, Mercer will briefly detail the relevant chronologies.

      **a.    Skelly's "Pro Val" Opinion**

Plaintiffs produced five expert reports on September 6, 2007, containing three separate "damage" models. Two of these damage models were created using the "Pro Val" program, a proprietary actuarial software typically used for database management, annual valuations, contribution and expense calculations, forecasting, and asset allocation.[5] Plaintiffs did not produce *any* Pro Val files in support of these initial "damages" calculations.[6]

During his November 2, 2007 deposition, one of Plaintiffs' experts, an actuary, Gene Kalwarski, disclosed that one of the Plaintiffs' damage models which relied on the Pro Val program was being significantly revised "in excess of $200 million."[7] Plaintiffs subsequently produced a "revised" version of this "damage" model on November 9, 2007, which did indeed increase their asserted "pension plan damages" by almost 60%.[8] Plaintiffs also for the first time produced Pro Val supporting files for their damage calculations on November 9, 2007 and

---

[4] *See* Deposition of Dennis Skelly, March 11, 2008 ("Skelly III"), p. 7, excerpts from which are attached hereto as Exhibit 1.
[5] A full description of this software is available at http://www.winklevoss.com/wintech/products/proval/index.asp?mt=6.
[6] Maggard Decl, ¶ 3.
[7] *See* Deposition of Gene Kalwarski, pg. 105 (Q. "And do you have any idea of the effect or impact of the change in terms of dollars on Model 3?" A. "I understand the numbers are going up and not insignificantly." Q. "Approximately how much? What number have you heard?" A. "In excess of $200 million."). Excerpts of Mr. Karlwarski's deposition are attached hereto as Exhibit 2.
[8] *Compare* September 6, 2007 Expert Report of Kim Nicholl at 28 ($133 million) *with* February 8, 2007 Expert Report of Kim Nicholl at 9 ($212 million), excerpts of which are attached hereto as Exhibits 3-4. Ms. Nicholl confirmed in her deposition that the revision occurred because a member of her staff discovered that they had performed the initial calculation "improperly," by assuming that ERS participants would elect BackDROPs back to their earliest *reduced* retirement age. *See* Deposition of Kim Nicholl, January 10, 2008 ("Nicholl Dep."), pp. 107-108, attached hereto as Exhibit 5.

November 12, 2007.  However, these "output" files contained only "hard-coded" information, which did not allow Mercer to see the Pro Val formulas or calculations that Plaintiffs had used, thereby precluding any substantive response.  Mercer thus requested the Pro Val input files.[9]

On November 19 and November 20, the Plaintiffs produced Pro Val "input" files for the first time.  However, these files could only be opened in Pro Val, requiring Mercer to purchase a $14,000 license to be able to view Plaintiffs' input files.  Mercer was not able to obtain a license until December 2007 due to the vendor's concerns of a competitor accessing its proprietary software, but began analyzing the input files immediately after obtaining the license.  Mr. Skelly took the lead in performing these analyses.[10]

The reason for utilizing Mr. Skelly to analyze the Plaintiffs' Pro Val calculations was simple.  Unlike Plaintiffs, who had the luxury of preparing their offensive expert reports on their own timetable – and, indeed, revised them substantially during the course of expert discovery – Mercer had to respond defensively within an extremely short period of time.  Plaintiffs did not produce *any* substantive backup for their Pro Val files until November 2007, and Mercer was not able to access and begin analysis until December 2007.  This gave Mercer only a two-month period, including the Christmas holiday, to analyze the Plaintiffs' evolving "damage" claims and respond appropriately.  Against this backdrop, Mercer chose to have Dennis Skelly and his colleagues "in-house" at Mercer to perform its Pro Val analysis, which in turn flowed into the expert report of Mercer's retained expert, Donald Behan.[11]

---

[9] Maggard Decl., ¶¶ 4-5.
[10] Maggard Decl., ¶¶ 6-7.
[11] *See* Expert Report of Dennis Skelly ("Skelly Report"), ¶ 4 ("It is my understanding that some portions of these analyses have been incorporated into the expert report of Donald Behan, who has been engaged by defendant to provide expert testimony on, among other things, the plaintiffs' "damages" claims."), a copy of which is attached hereto as Exhibit 6.

Mr. Skelly confirmed in his recent expert deposition that he did not begin work on analyzing the Pro-Val calculations performed by Plaintiffs' experts until early to mid-December 2007.[12]

### b. Skelly's Retirement Rate Analysis

The second issue addressed by Mr. Skelly's expert report was the Plaintiffs' repeated, unsubstantiated claim that the enactment of the BackDROP caused a "dramatic shift" in early retirement by County employees. This claim first appeared in the Complaint filed in March 2006.[13] It next appeared in Plaintiffs' responses to Mercer's first set of interrogatories, served in March 2007.[14] At that time, Plaintiffs asserted that specific quantitative responses to Mercer's request for substantiation for the assertion of an early retirement "shift" would have to await Plaintiffs' expert reports.[15] Mercer again asked for substantiation of the claim in a notice of deposition to Milwaukee County under Fed.R.Civ.P. 30(b)(6) dated July 30, 2007.[16] Plaintiffs again objected that any such evidence supporting their claim would be the subject of their expert reports.[17]

Surprisingly, then, the Plaintiffs' expert reports, when served in September 2007, provided no quantitative analysis whatsoever of any change in retirement patterns caused by the enactment of the BackDROP effective January 2001. Indeed, Kim Nicholl, one of Plaintiffs' actuarial experts, testified as follows at her January 10, 2008 deposition:

---

[12] *Id.*, p. 9.
[13] *See* Complaint, ¶ 9 ("a BackDROP encourages people to retire earlier than they would have left otherwise").
[14] *See* Plaintiffs' Responses to Defendant's First Set of Interrogatories, pp. 5-6 ("The backDROP, in combination with other benefits, shifted the retirement pattern dramatically forward."), excerpts of which are attached hereto as Exhibit 7
[15] *Id.,* p. 5, n. 1.
[16] *See* Notice of Videotaped 30(b)(6) Deposition of the Employees' Retirement System of the County of Milwaukee (identifying as a subject matter of the deposition evidence supporting the claim that "the backdrop, in combination with the other benefits, shifted the retirement pattern dramatically forward"), attached hereto as Exhibit 8.
[17] *See* Letter, James T. Southwick to Eric J. Van Vugt and Paul D. Bauer, August 1, 2007 at 2 (objecting that the issue of a shift in retirement pattern is "a question for expert testimony – not yet required for discovery under the scheduling order" and stating that "we are going to object to fact witnesses on expert issues"), attached hereto as Exhibit 9.

> Q: Have you done any work since July that would lead you to the conclusion that people who took the backDROP in Milwaukee County did in fact retire at earlier ages than people who didn't take the backDROP?
>
> A: No.
>
> Q: Okay. In fact you know, don't you, that the reverse is true, that people who took the backDROP tended to retire at older ages than people who didn't take the backDROP?
>
> A: I have not studied that. I have not looked at that.
>
> ***
>
> Q Okay. In your [July 2007] deposition on page 133 I asked you -- I'll give you time to pull it out. I asked you a question. "Have you ever done any study about the average retirement ages prior to 2001? "Answer: No." My question today is, since you've been retained as an expert, have you done any study about the average retirement ages prior to 2001?
>
> A No. [18]

Logically, if Plaintiffs' experts did not analyze retirement ages *prior* to 2001, and did not analyze whether people who took the BackDROP *after* it was enacted in 2001 retired earlier than people who did not take the BackDROP, they can offer no opinion that the BackDROP caused a shift, "dramatic" or otherwise, toward earlier retirements.

Nevertheless, Mercer continued to press Plaintiffs for *any* quantitative support for their allegation that the BackDROP caused earlier retirements, including via a letter dated January 25, 2008.[19] Finally, on February 12, 2008 – the day before Mercer's own expert reports were due – Plaintiffs' counsel provided Mercer a letter containing fifteen bullet points purporting to provide the "quantitative as well as qualitative analysis based on actuarial science" that supported their

---

[18] *See* Exhibit 5, pp. 63, 66-67.
[19] *See* Letter, Paul D. Bauer to Kenneth E. McNeil, January 25, 2008, p. 3, attached hereto as Exhibit 10.

claims.[20] However, none of these bullet points refer to or provide any quantitative analysis of retirement patterns, but simply repeat the same stale and unsupported allegations Plaintiffs, through their counsel, have made throughout the case.

It is against this background that Mercer chose, quite late in the day, to have Dennis Skelly provide an expert opinion in his February 13, 2008 expert report that demonstrated, based on his review of Milwaukee County retirements from 1993-2007, "there has been no long term trend toward higher utilization of early retirements" after enactment of the BackDROP.[21] Indeed, as Mr. Skelly shows, the average person who retired with the BackDROP from 2001-2007 was substantially *older* than the average person who retired without the BackDROP.[22] Put simply, there is no quantitative support for Plaintiffs' allegations that the BackDROP caused earlier retirements, and there never was. This absence of any quantitative support, after two years of litigation, is particularly troubling, as it is the assumption upon which Plaintiffs base more than $100 million in "damages" allegedly arising out of increased healthcare costs due to earlier retirements.[23]

**2.      Correspondence Between the Parties on the Issue of Skelly's Expert Report**

The issue raised by Plaintiffs' motion to compel was the subject of a series of emails and letters between counsel since Mercer's expert reports were served on February 13, 2008. Because Plaintiffs did not include all of this correspondence as exhibits to their motion, Mercer does so here.[24]

---

[20] *See* Letter, Kenneth E. McNeil to Paul D. Bauer, February 12, 2008, attached hereto as Exhibit 11.
[21] *See* Exhibit 6, ¶ 8.
[22] *See id.,* ¶ 20 ("By way of example, the most recent data for 2007 received from the County shows that the average age of retirees who took the BackDROP from January through November 2007 was 59.8 years, while the average age of retirees who were not even eligible for the BackDROP was 54.4 years, more than five years younger").
[23] *See* Plaintiffs' March 11, 2008 Status Letter, p. 4 ("There is an additional $100 million or more in damages from health care costs triggered by the unexpected shift toward earlier retirement").
[24] *See* Email, Kenneth McNeil to Paul D. Bauer, February 26, 2008, attached hereto as Exhibit 12; Letter, P. Bauer to K. McNeil, March 3, 2008, attached hereto as Exhibit 13; Letter, K. McNeil to P. Bauer, March 4, 2008, attached

- 8 -

## ARGUMENT

**I. The Federal Rules Of Civil Procedure Do Not Require Mercer To Provide An Expert Report For An Employee-Expert Like Dennis Skelly.**

In arguing for the production of privileged materials involving Dennis Skelly, Plaintiffs contend that "[t]he Federal Rules of Civil Procedure… and the relevant case law all require that testifying experts must disclose all the materials considered in forming their opinions, regardless of privilege."[25] Plaintiffs are wrong on this threshold issue, as the plain language of Fed.R.Civ.P. Rule 26(a)(2)(B) only requires expert disclosures from experts "retained or specially employed to provide expert testimony in the case" or whose "duties as the party's employee regularly involve giving expert testimony." Under the Federal Rules, therefore, *non-retained* employee experts, who do *not* regularly give expert testimony, are not required to produce anything in support of their opinion testimony, neither a report nor any supporting materials, much less privileged communications with counsel. Numerous federal courts have adopted this reading of the Federal Rules. *See, e.g., Bowling v. Hasbro*, 2006 WL 2345941 (D.R.I. 2006); *Adams v. Gateway, Inc.*, 2006 WL 644848 (D. Utah 2006)(the plain language of the rule facilitates a party's use of an employee for expert witness testimony without the burden of a formal report); *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 182 n.13 (2d Cir. 2004); *Lewis v. Triborough Bridge & Tunnel Auth.*, 2001 WL 21256 at *1 (S.D.N.Y. 2001); *Peck v. Hudson City Sch. Dist.,* 100 F. Supp.2d 118, 121 (N.D.N.Y. 2000); *Duluth Lighthouse for the Blind v. C.G. Bretting Mfg. Co.*, 199 F.R.D. 320 (D. Minn. 2000); *Kent v. Katz*, 2000 WL 33711516, at *1 (D. Vt. 2000); *Navajo Nation v. Norris*, 189 F.R.D. 610, 613 (E.D. Wash.

---

hereto as Exhibit 14 (also attached to Pls.' Brief as Exhibit E); Letter, P. Bauer to K. McNeil, March 11, 2008, attached hereto as Exhibit 15.
[25] *See* Pls.' Brief, p. 2.

QBACTIVE\6160274.1

1999)(drafters of FRCP 26(a)(2)(B) could simply have required reports for all employee-experts if that is what they had intended); *Salas v. United States*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995).

To be sure, other federal courts have taken the opposite approach, as Mercer has conceded in its correspondence with opposing counsel.[26] *See, e.g., Dyson v. Maytag*, 241 FRD 247 (D.Del. 2007), *KW Plastics v. U.S. Can Co.,* 199 F.R.D. 687, 688 (M.D.Ala.2000); *Minnesota Mining & Mfg. Co. v. Signtech USA, Ltd.,* 177 F.R.D. 459 (D.Minn.1998). As the *Hasbro* court aptly noted, "[t]here is a split of authority on the interpretation of this procedural rule. 2006 WL 2345941, *1. One line of cases "ignores the plain language of Rule 26(a)(2)(B) and refuses, for policy reasons, to recognize an exemption to the report requirement for certain employee-experts," while another line of cases s "strictly construes the text of Fed.R.Civ.P. 26(a)(2)(B) and finds a written report exemption for employee-expert witnesses who are not specially employed to provide expert testimony and do not regularly testify as experts." *Id.*

Mercer contends, however, following the *Hasbro* and *Adams* courts, that those other courts that have found a duty to produce expert reports for employee-experts "have unnecessarily stretched to find a reason that the Rule requires a report for an employee expert witness who is not specially employed and does not regularly testify, when the Rule clearly says otherwise." *Id.*, *2, *citing Adams*, 2006 WL 644848, *3. The better reading of Rule 26(a)(2)(B) flows from its plain language, which clearly creates an exemption for such employee-experts.

Skelly is a non-retained employee expert, who does not regularly give expert testimony; under the Federal Rules, therefore, Plaintiffs were not even entitled to an expert report from him, much less to discovery of privileged communications he may have had with Mercer's counsel. Because Mercer did provide a report and thousands of pages of supporting spreadsheets, as well

---

[26] *See* Exhibits 13, 15.

as making Mr. Skelly available for an expert deposition, Mercer provided "more than the Rules require." *See GSI Group,* 2007 WL 853959, *2, n. 2.

**II.    Although Local Rule 26.1(a) Does Require Expert Disclosures From "Hybrid Fact/Expert Witnesses Such As Treating Physicians," The Rule Should Not Be Construed To Require A Professional Who Is Defending His Own Conduct To Produce An Expert Report.**

A second issue arises from the operation of the Eastern District of Wisconsin's Local Rules. As the Advisory Committee Notes to Fed.R.Civ.P. Rule 26(a)(2)(B) make clear, "[b]y local rule… the requirement of a written report may be… imposed upon additional persons who will provide opinions under Rule 702. Thus, under Eastern District of Wisconsin Local Rule (Civil) 26.1(a), disclosure of an expert report *is* required from "hybrid fact/expert witnesses such as treating physicians."

Mercer contends that this Local Rule, on its face, addresses only treating physicians and, perhaps, similar third-party professionals who may offer expert testimony, such as the appraiser who has previously evaluated a property where the valuation of the property is in dispute; or the inspector who had inspected the wiring in a commercial building prior to a fire on the premises. It does not – and should not – be construed to require expert reports from employee-experts such as Skelly, whose professional work as an employee of the defendant is being directly challenged in this actuarial malpractice action. Indeed, following the logic of the *Navajo Nation* court, had the drafters of the Local Rules for the Eastern District of Wisconsin "intended to impose a report obligation on all employee-experts, they could have and would have done so." 189 F.R.D. at 613. Certainly, had they intended to extend the requirement of an expert report to all professionals, even those who are essentially defendants in malpractice suits, they would have done so explicitly. Instead, those drafters specifically limited their extension of the expert report requirement of Rule 26(a)(2)(B) to treating physicians and, arguably, similar third-party experts.

Mercer is aware of only two decisions in the Eastern District of Wisconsin that have interpreted or applied L.R. 26.1. Both are quite recent; neither is helpful in this matter. The first, *Reese v. Tank*, 2006 WL 1049599, *4 (E.D.Wis.), does not address the status of an employee-expert under L.R. 26.1(a), but simply deals with the issue of the timing of expert disclosures under L.R. 26.1(c). The second, *Bell v. Columbia St. Mary's Hospital Milwaukee, Inc.*, 2008 WL 163671 (E.D.Wis.), was issued in January 2008, and does apply L.R. 26.1(a), but simply to require treating physicians in an Americans with Disabilities Act case to submit expert reports. Interestingly, however, *Bell* treats even the issue of expert reports for treating physicians – seemingly directly addressed by the local rule – as an open issue. *Bell* does not extend the rule to other types of "hybrid fact/expert witnesses," and does not intimate in any way that such an extension would be warranted.

### III. Mercer's Production of An Expert Report for Skelly Does Not Constitute a Waiver of Its Attorney-Client or Work-Product Privileges With Regard to the Subject Matter of His Report.

As stated above, in an abundance of caution, to prevent Plaintiffs from later claiming unfair surprise at trial, Mercer produced a narrow report for Skelly setting forth two expert opinions. Mercer also produced over 29,000 pages of documents supporting Skelly's report, revealing all of the bases for his opinions and allowing Plaintiffs to run their own analyses and calculations.[27] Skelly was further deposed as an expert in this case on March 11, 2007, allowing the Plaintiffs to obtain any discovery they wished related to his opinions.

Not satisfied with receiving Skelly's expert report and the thousands of pages of supporting documents, all of which, in Mercer's view, go beyond what the Federal Rules and Local Rule 26.1(a) require, Plaintiffs' motion seeks to invade Mercer's attorney-client and work product privileges to obtain all communications and documents Dennis Skelly has ever written

---

[27] *See* Maggard Decl. ¶ 2.

or received related to Pro Val computer work or the issue of retirement rates at the County. Indeed, it is worth noting that Plaintiffs' motion *only* seeks these privileged materials, as all other supporting documents have already been produced. Moreover, Plaintiffs' demands for privileged documents are not limited by time period or even whether Skelly received material in his role as an expert.[28]

The question squarely before the Court, then, is whether a party, once it produces an expert report disclosing the opinions of an employee-expert, whether or not obligated to do so, thereby waives its attorney-client or work product privileges for any and all communications between its counsel and the employee-expert related to the subject matters of his report. The answer is far from clear. What is clear, however, is that this is a case of first impression in this Court, and the only Seventh Circuit authority addressing an analogous fact pattern explicitly rejects Plaintiffs' arguments. In the *GSI Group* case, the court explicitly held that non-retained employee experts are not required to produce either expert reports or any documents in support, and further that the "decision to use them as expert witnesses does not constitute a waiver of [the party's] claims of privilege to the documents sought." 2007 WL 853959 at *2. Although Mercer brought this decision to the attention of Plaintiffs' counsel prior to its motion, Plaintiffs do not mention it in their motion papers.[29]

Instead, Plaintiffs cite two cases from this Circuit and two from other Circuits. The two cases they cite from the Seventh Circuit are completely inapposite, as they do not involve expert testimony whatsoever, and indeed, do not even have the word "expert" anywhere in the opinion.

---

[28] *See* Pls.' Brief at 3 (demanding "information relevant to his opinions *before* he was designated as an expert witness"); Pls.' Brief at 4 (demanding any information that "Skelly, *in his role as a Mercer employee*, was exposed to . . .") (emphasis added).
[29] *See* Exhibits 13, 15.

- 13 -

*See* Pls.' Brief, p. 5, citing *Vardon Golf v. Karsten Mfg. Co.*, 213 F.R.D. 528 (N.D. Ill. 2003); *Powers v. Chicago Trans. Auth.*, 890 F.2d 1355 (7th Cir. 1989).

The only other two cases the Plaintiffs cite are (a) outside the Seventh Circuit, (b) readily distinguishable and/or superseded by other decisions, and (c) even if fully credited, do not support the sweeping, unlimited waiver of privilege that Plaintiffs assert. *See* Pls.' Brief, pp. 3-5, citing *Dyson v. Maytag*, 241 F.R.D. 247 (D. Del. 2007); *Construction Industry Service Corp. v. Hanover Ins. Co.*, 206 F.R.D. 43 (E.D.N.Y. 2001). In *Dyson*, the court admitted it had not "had occasion to consider" issues involving "an employee-expert witness" before, but nevertheless held that information "considered by a testifying expert in formulating his or her report" must be produced, "without regard to asserted privilege." *Dyson*, 241 F.R.D. at 249-250. *Dyson* is wholly distinguishable, because the employee expert in *Dyson* was only tangentially related to the facts of the case, while Skelly is both a key fact witness and Mercer's client contact.

Moreover, the *Dyson* court rejected a request for production of *all* materials considered "before or in connection with the formulation of [the] expert opinions, regardless of any claims of attorney-client privilege, work-product protection, or time limitations before or after his designation as a testifying expert." *Id.* at 251. Instead, the *Dyson* court specifically held that "general information regarding his ordinary job duties" or "information and documents not considered by [the expert] in connection with his expert report" remained privileged. *Id.* Therefore, even if this Court finds *Dyson* persuasive, it still does not provide authority for Plaintiffs' broad requests without any time or role limitations.

*Construction Industry* provides even less support for Plaintiffs, as the testifying expert in that case was the party's *outside* accountant, not its employee. 206 F.R.D. at 50 (describing the testifying expert "as both the outside accountant who worked as a financial consultant and

business advisor to Cisco and as Cisco's designated damages expert at trial"). More significantly, the Second Circuit held three years later that employee-experts do *not* have any obligation to produce expert reports or other supporting documents. *Bank of China,* 359 F.3d at 182, n.13. Whatever persuasive authority *Construction Industry* may provide is in serious doubt after *Bank of China*, and in any event, is contrary to the only Seventh Circuit case to consider the issue, the *GSI Group* case.

**IV.     Even If Discovery Of A Non-Retained Employee Expert's Privileged Materials Is Permissible In Certain Circumstances, No Discovery Should Be Permitted In Professional Malpractice Actions.**

As set forth above, while caselaw is divided over whether a non-retained employee expert must disclose privileged documents and communications related to his or her expert report, once that expert report is produced, the more principled approach, following *GSI Group*, is to preserve all privileges.

Within the context of professional malpractice, this principle is particularly forceful, as the line between defenses and opinions as a fact witness and as an expert witness is necessarily blurred. As a defense expert, Skelly is simply responding to allegations made by the Plaintiffs about *his own work* as a professional – Skelly's professional opinions of that work are highly relevant, whether framed as lay opinion or expert testimony. The fact that Skelly is equally qualified to opine on the applicable standard of care governing actuaries as the Plaintiffs' experts cannot result in the broad-based waiver of all applicable privilege that Plaintiffs seek here.

Indeed, in Plaintiffs' own questioning of Dennis Skelly during his April 10, 2007 deposition as a fact witness, ten months before Mercer served his expert report, they were already asking Mr. Skelly numerous questions seeking to elicit opinion testimony on issues within his expertise as an actuary, including questions about the application of actuarial

- 15 -

standards of practice and the standard of care generally applicable to pension actuaries.[30] Plaintiffs' position on this motion would logically mean that Mercer would not be able to respond to such lines of questioning at trial without producing an expert report from Mr. Skelly and waiving its attorney-client and work product privileges as to any privileged conversations with him. That certainly cannot be and should not be the rule in professional negligence cases.

Moreover, the wholesale invasion of Mercer's privileges demanded by Plaintiffs is completely unnecessary. Plaintiffs *know* Skelly's opinions on these two narrow issues, and have received thousands of pages supporting these opinions. Plaintiffs claim this information is necessary "to adequately cross-examine Mr. Skelly about his expert opinions," ignoring the fact that Skelly was made available for deposition and fully answered all questions propounded to him. In the course of this deposition, Plaintiffs barely attempted to cross-examine Skelly on the merits of his retirement rate analysis. This is unsurprising – Plaintiffs's experts have not provided any analysis in any expert report supporting the alleged causal link between enactment of the BackDROP and early retirement; if they had such support, and if it supported substantive cross-examination of Mr. Skelly on the issue, they would have produced it already. Plaintiffs similarly avoided any substantive examination of Skelly concerning the host of mathematical and logical errors made by Plaintiffs' experts with regard to the "Pro Val" software. Plaintiffs cannot now claim they have a "substantial need" for information they did not choose to pursue during Skelly's expert deposition even though he was prepared to discuss his opinions at any level of detail the Plaintiffs' required.

---

[30] *See* Deposition of Dennis Skelly, April 10, 2007, pp. 25, 49, 176 (questioning about actuarial standards of practice or "ASOPs"); pp. 83-84 (questioning about standard of care applicable to actuaries). Excerpts of the April 10, 2007 Skelly deposition are attached hereto as Exhibit 16.

QBACTIVE\6160274.1

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Compel.

Dated this 28th day of March, 2008.

                                         s/ Eric J. Van Vugt
                                         QUARLES & BRADY LLP
                                         411 East Wisconsin Avenue, Suite 2040
                                         Milwaukee, WI  53202-4497
                                         (414) 277-5625
                                         ejv@quarles.com

                                         *Attorneys for Mercer Human Resource Consulting, Inc.*