UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MILWAUKEE COUNTY, EMPLOYEE'S
RETIREMENT SYSTEM OF THE COUNTY
OF MILWAUKEE, and PENSION BOARD,
EMPLOYEE'S RETIREMENT SYSTEM OF
THE COUNTY OF MILWAUKEE,

        Plaintiffs,

                                           Case No. 06-CV-0372

v.

MERCER HUMAN RESOURCE
CONSULTING, INC.,

        Defendant.

---

**BRIEF IN SUPPORT OF MERCER'S
MOTION FOR SUMMARY JUDGMENT**

---

    Defendant Mercer Human Resource Consulting, Inc. ("Mercer"), now known as Mercer

(US) Inc., submits this brief in support of its motion for summary judgment.

**<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>**

> "It's not rocket science, I just did it."
> --Gary Dobbert on the BackDROP

    This case involves the wage and benefit package enacted by Milwaukee County (the

"County") in the fall and winter of 2000-2001 as part of its 2001-2004 labor agreements with

County employees ("the Package") and, specifically, the "BackDROP" pension benefit that was

part of the Package.   BackDROPs were "very new" in 2000 and are "very rare" forms of

deferred retirement option provisions (or "DROPs") that allow participants to receive lump sums

upon retirement.[1]   It is undisputed that Milwaukee County's Director of Human Resources, Gary Dobbert ("Dobbert"), designed the BackDROP with "minimal help" from anyone and without consulting Mercer on its design.[2]

Despite Mercer's lack of involvement in the design of the BackDROP, the County, together with its pension fund, the Milwaukee County Employes' Retirement System ("ERS"), a separate legal entity, and its governing Pension Board, sued Mercer, their former actuary, years after the events, for Mercer's alleged role in the enactment of the BackDROP.   The basic theory of the Plaintiffs' case is that Mercer somehow should have stopped the County Board of Supervisors – the decisionmakers in County government – from enacting the benefit that Dobbert had designed.   The Plaintiffs claim that they have suffered more than $100 million in damages as a result of their "reliance" on Mercer.

Mercer's motion for summary judgment seeks the dismissal of the Complaint and *all* of Plaintiffs' causes of action on the simple premise that there is no evidence in the record that *anyone* on the County Board of Supervisors relied on Mercer's advice in making the decision to enact the BackDROP, much less that a *majority* of Supervisors did so.   Indeed, with regard to each of the specific factual allegations the Plaintiffs have raised supposedly supporting their claims against Mercer, the evidence in the record demonstrates that *no one* at the County Board relied on anything Mercer did or did not do:

- ***The October 27, 2000 Pension Study Commission Hearing.*** The centerpiece of the County's case against Mercer is its allegation that Mercer should have "spoken up" at an October 27, 2000 Pension Study Commission ("PSC") hearing to tell PSC members that Mercer had *not* yet performed a cost analysis of the BackDROP.   Disclosing this fact was supposedly necessary because Dobbert had

[1] *See* Mercer's Proposed Findings of Fact in Support of Its Motion for Summary Judgment ("PFF") ¶¶ 1-2. Although the enactment of the BackDROP is the focus of this case, the details of how the benefit works in practice are not essential for purposes of this motion.
[2] PFF, ¶ 3.  Dobbert pled no contest to one felony and two misdemeanors for his misconduct in connection with the enactment of the BackDROP.   PFF, ¶4.

submitted a memorandum to the PSC dated October 25, 2000 suggesting incorrectly that "the actuary" had performed such an analysis and had concluded the BackDROP's cost was "minimal." But the undisputed facts demonstrate that *none* of the County's decisionmakers relied on Dobbert's memorandum or their supposed misunderstanding of it in enacting the BackDROP. For instance:

- Mark Borkowski ("Borkowski"), a member of both the County Board and the PSC who was the only County Supervisor of the three Supervisors on the PSC who ended up voting for the Package, testified that he never even saw the Dobbert memorandum or the October 3, 2000 Mercer letter Dobbert attached, so he could not have been misled into believing that Mercer had analyzed the cost of the BackDROP.

- There is also no evidence in the record that other County Board members – the ultimate decisionmakers – ever reviewed Dobbert's memorandum or Mercer's letter, so they too could not have been relying on a misunderstanding that Mercer had already performed a cost analysis on the BackDROP.

- Dobbert *himself* knew that he had not asked for a cost analysis for the BackDROP from Mercer as of October 27, 2000, and his knowledge must be imputed to the County as a matter of law.

- The County enacted the BackDROP for its largest union, AFSCME District Council 48 ("DC 48"), in February 2001, *after* Mercer had performed a cost analysis of the BackDROP. As a matter of simple logic, *not* knowing the need for a cost analysis of the BackDROP in October 2000 cannot have caused its enactment if the County enacted the same benefit three months later *after* it had received a cost analysis.

- ***Mercer's January 16, 2001 Cost Analysis for the BackDROP.*** Plaintiffs next allege that a January 16, 2001 letter from Mercer to Dobbert, which provided Mercer's initial cost analysis of the BackDROP showing a $718,000 annual cost increasing every year for 35 years, negligently underestimated the cost of the benefit. Against, the undisputed evidence shows that County decisionmakers did not rely on Mercer's cost analysis in enacting the BackDROP:

  - Dobbert did not pass Mercer's BackDROP cost analysis on to any of the County decisionmakers – the County Board. Not having ever seen Mercer's analysis, the County Board members who voted to enact the BackDROP in February 2001 for DC48 could not have relied on it.

  - Dobbert never revised the "fiscal note" accompanying the ordinance enacting the Package to include the BackDROP cost Mercer had calculated. Fiscal notes are required by law to accompany every new

ordinance proposed for enactment.   Again, not having access to the cost figures Mercer had calculated for the BackDROP in the required fiscal note, the County Board members who voted to extend the BackDROP in February 2001 to DC 48 could not have relied on them.

- **Mercer's "Virtual Guarantee" of 12-13% Investment Returns.**  Plaintiffs' most far-fetched allegation is that they relied on statements by Mercer actuary Glenn Soderstrom ("Soderstrom") in a June 8, 2000 letter to Dobbert and in the October 27, 2000 PSC hearing allegedly "virtually guaranteeing" that the ERS would earn 12-13% annual investment returns for 35 years.   Again, there is no evidence in the record that any of the ultimate County decisionmakers relied on  these statements.   And, in any event, the claim is defeated by simply reviewing the full contexts of Soderstrom's statements, in which Soderstrom clearly cautions the County that market volatility and economic uncertainty are inevitable.  Indeed, in both instances Soderstrom expressly told the County that Mercer could *not* "guarantee" future investment results.   Thus, any reliance by the County on Soderstrom's statements was unjustifiable e as a matter of law.

Absent the element of justifiable reliance, each of the Plaintiffs' causes of action fails as a matter of law.

Mercer also moves separately for summary judgment as to *all* claims brought by the ERS and its Pension Board as plaintiffs, because all of the Mercer work challenged by the Plaintiffs was performed under its separate contract with the County, not under its long-standing, larger relationship with the Pension Board; and because, in any event, neither the ERS nor the Pension Board can be harmed by the enactment of pension benefits, because the County is obligated to fund any benefits it enacts.   As the Plaintiffs have asserted successfully in prior litigation surrounding the Package, the ERS and the Pension Board simply had no involvement with the County's decision-making process in enacting the BackDROP, and thus could not have taken action in reliance on Mercer.    And, as the current Chair of the County Board, Lee Holloway ("Holloway"), has testified, no one involved in the pension has been harmed.   The ERS and the Pension Board are not proper parties in this action and should be barred under the doctrine of judicial estoppel from claiming otherwise.

## UNDISPUTED MATERIAL FACTS

The undisputed material facts detailed herein are only those that are necessary for resolution of this motion, which focuses on the complete absence of any evidence that the Plaintiffs relied on Mercer's advice in enacting the BackDROP. They are drawn largely from published County reports; documents from the County's own files; the depositions of County personnel in this case and in the many prior litigations arising out of the 2000-2001 benefit enhancements; the statements of County personnel to Wisconsin Department of Justice investigators during their criminal investigation of Dobbert; and pleadings by the County and the ERS during this action and in earlier lawsuits against them brought by different groups of ERS participants.

1.      **The Parties**

There are three Plaintiffs. The first, Milwaukee County, is a Wisconsin body corporate. The powers of the County are exercised by its Board of Supervisors, which in 2000 and 2001 had 25 members. The County's chief executive officer is the County Executive, who in turn appoints and supervises department heads such as the Director of Human Resources. The County Board of Supervisors has as one of its committees a seven-member Personnel Committee, whose purpose is the oversight of Human Resources and Labor Relations functions.[3]

In addition, within Milwaukee County government there is a five-member Pension Study Commission with jurisdiction over all proposed changes in the County's retirement system, whose role is to "advise the county board as to the actuarial effect and the cost implications of all proposed changes" to the County's retirement system.[4]

---

[3] PFF, ¶¶ 5-8
[4] PFF, ¶ 9.

That system is the second Plaintiff, the Milwaukee County Employees' Retirement System. The ERS is a separate legal entity established pursuant to Chapter 201 of the Laws of 1937, State of Wisconsin and Chapter 405, Laws of 1965, and Chapter 201.24 of the General Ordinances, Milwaukee County. Pursuant to state law and County ordinances, the administration and operation of the ERS is vested with the Pension Board, the third Plaintiff in this action.[5]

The Defendant, Mercer, is an actuarial firm with offices in Milwaukee and around the world providing actuarial services to clients that include governmental pension plans like the ERS. Mercer was the actuary to the ERS from at least the 1980s through December 2005, and separately also provided certain services to the County. Mercer's main consultants in performing actuarial services for the ERS and the County were Dennis Skelly ("Skelly") and Soderstrom, both of whom work for Mercer at its Milwaukee offices.[6]

**2.** **The Roles of the County and the ERS in Enacting Changes to Pension Benefits**

Because Mercer is moving, *inter alia*, for summary judgment as to all claims brought by the ERS and the Pension Board because they are not proper parties to this action, it is important for the Court to understand the specific statutory roles the County and the Pension Board fulfill with regard to the County's pension system.

First, the members of the Pension Board charged with running the ERS "are not policy makers." Thus, the Pension Board *cannot* make changes to the benefit structure of the ERS. That authority belongs to the County's Board of Supervisors. The Pension Board has no role in

---

[5] PFF, ¶¶ 10-11. The ERS has argued in a prior litigation that the Pension Board *per se* is not a proper party to an action involving the ERS, because "the Pension Board is similar to a corporation's board of directors. Therefore, the proper [party] is the ERS, not the Pension Board. After all, when a party sues General Motors, the proper defendant is the corporation named General Motors, not its board of directors." PFF, ¶ 12.
[6] PFF, ¶¶ 13-15.

negotiating contracts with County employees or their unions. Its role is simply to administer the County's pension plan "as-is," as it has been enacted by the County's Board of Supervisors.[7]

With regard to the 2000-2001 pension enhancements specifically, the ERS asserted as an undisputed fact in prior litigation that it "played no role in the passage" of the BackDROP and "was never consulted nor included in the process":

> It is also undisputed that Defendant ERS played no role in the passage of the Pension Enhancements. The Pension Study Commission is... a creature of the ordinances and reports to the MC Board, and the Personnel Committee is a creature of the MC Board, and their role in the passage of the Pension Enhancements had nothing to do with Defendant ERS.... In fact, Defendant ERS did not become a participant in any activity related to the Pension Enhancements until after the Pension Enhancements had been passed by the MC Board.

Moreover, the ERS itself asserted in the same litigation that the ERS had "no authority to reject [the Package], or to otherwise refuse to administer its provisions." The ERS thus itself argued that it was not a proper party to an action by a class of County employees who had not received the BackDROP against the County alleging that the enactment of the BackDROP constituted an unconstitutional taking, precisely because it had played no role in the enactment.[8]

Instead, the series of events in late 2000 and early 2001 that led to the enactment of the BackDROP were all performed by elements of the County government – the PSC, the Personnel Committee, and the County Board:

- On October 27, 2000, the PSC considered the pension enhancements to be include in the package, and voted 3-2 to recommend them to the Board.

---

[7] PFF, ¶¶ 16-19.
[8] PFF, ¶¶ 20-26  Similarly, the County argued that *it* was not a proper party to an action brought against the ERS, *Vernon v. Milwaukee County et al.,* Case No. 04-CV-004949 (Milwaukee County), related to a dispute over a County employees' disability benefits, because "Milwaukee County and the [ERS] are separate legal entities," noting that "[t]he County is responsible for funding the pension system. ERS is responsible for maintaining the fund and administering benefits."  PFF, ¶ 27.

- In a meeting immediately following the PSC hearing on October 27, 2000, the Personnel Committee voted 5-1 to recommend that the Package be forwarded to the County Board for adoption for the County's non-represented employees.

- The County Board approved the Package for the County's non-represented employees by a vote of 20-5 on November 2, 2000.

- The Personnel Committee approved the Package for the County's largest union, DC 48, on February 9, 2001 by a vote of 6-1.

- The County Board adopted the Package for DC 48 on February 15, 2001 by a vote of 22-2.[9]

Melvin Marino ("Marino"), a member of the Pension Board at the time of the 2000-2001 benefit enhancements, confirmed that he did not even learn of the BackDROP until March or April of 2001, months after it had been enacted. The Pension Board members were "the last ones to know."[10]

Further, it is undisputed that the County is obligated to contribute whatever is necessary to fund the ERS' payment of promised pension benefits to County retirees, and that the "full faith and credit of the County… stands behind" the ERS. In short, "the ERS is assured sufficient contributions from the County to support" any and all benefit obligations; "the County is fully committed to pay the 'cost' of the ERS." It is also undisputed that "[a]t no time has any ERS participant failed to receive all benefits for which he/she is or was eligible… all benefits have been paid timely and in full, and there is no likelihood that will change in the foreseeable future."[11]

Thus, as Lee Holloway ("Holloway"), the current Chairman of the County Board of Supervisors, has stated "[n]o one that's involved in the pension, as far as I know, has been harmed." Similarly, Jeremiah Hegarty ("Hegarty"), the Chair of the Pension Board in 2000-

---

[9] PFF, ¶¶ 28-32
[10] PFF, ¶¶ 33-34.
[11] PFF, ¶¶ 35-37.

2001, has testified that the ERS was not injured by passage of the BackDROP because, *inter alia,* "[t]he county has guaranteed it… It's a defined benefit plan. It's a property right and ultimately if not paid, the county is responsible."[12]

### 3. Mercer's Separate Contracts With The ERS and the County.

Mercer had separate contracts with the ERS and the County governing its work during the fall and winter of 2000-2001, the period when the BackDROP was enacted. The scope section of Mercer's contract with the ERS and Schedule A attached thereto defined the services Mercer was to provide the ERS, which centered on producing the ERS' annual actuarial valuation report and calculating the estimated contribution the ERS would request each year from the County. Notices to the ERS under this agreement were to be made to Jac Amerell ("Amerell"), the Secretary of the Pension Board, and the agreement was signed by Hegarty.[13]

The scope section of Mercer's contract with the County defined the services Mercer was to provide the County as follows: "[Mercer] shall specifically provide County with pension-related actuarial analyses and ad hoc oral and written reports as required during labor negotiations, budget preparations, and in response to requests from County department heads and elected officials." Here, the contract stipulates

- that "Milwaukee County, a Wisconsin municipal body corporate… [is] represented by Gary J. Dobbert, Director of Human Resources";

- that payment of Mercer's fees would be "contingent upon the approval of the Director of Human Resources," namely, Dobbert; and

- that "[n]otices to the County… shall be sufficient if sent [to] Gary J. Dobbert, Director of Human Resources. "

---

[12] PFF, ¶¶ 38-39.
[13] PFF, ¶¶ 40-42.

The contract is signed on behalf of the County by Dobbert.[14]

In other words, from Mercer's perspective in working for the County, Dobbert *was* the County.   As Soderstrom  has testified, in his mind, "Gary Dobbert and the County are synonymous."[15]

Dobbert concedes that he was Mercer's contact person for purposes of dealing with County on matters relating to the 2000-2001 labor negotiations and the benefit enhancements at issue in this case.  Karen Ordinans ("Ordinans"), the Chairman of the County Board of Supervisors at the time of the benefit enhancements, confirmed that the County was represented in the Mercer contract by Dobbert.   Clifford Van Beek("Van Beek"), a member of the Pension Board at the time of the 2000-2001 benefit enhancements, also confirmed that there were two separate contracts with Mercer, one with the ERS and one with the County, and that Dobbert controlled access to Mercer.[16]

Dobbert's discussions of pension benefit enhancements with Mercer in 2000 were *always* in his role as Milwaukee County Director of Human Resources.   Guy Stuller ("Stuller"), a member of the Pension Board at the time, confirmed that Mercer's work on the 2000-2001 pension benefit enhancements would not have been "within the bounds" of the Pension Board's contract with Mercer, but would have come under Dobbert's separate contract with Mercer.[17]

---

[14] PFF, ¶¶43-47.
[15] PFF, ¶ 48
[16] PFF, ¶¶ 49-51.
[17] PFF, ¶¶52-53.

### 4. The Plaintiffs' Claims Against Mercer

The Plaintiffs assert four substantive causes of action against Mercer for professional negligence, intentional misrepresentation, negligent misrepresentation, and breach of contract.[18] Plaintiffs have conceded, however, that the factual allegations supporting each of these claims are identical.[19] They are:

- That Mercer failed to advise the County during the October 27, 2000 PSC hearing on the pension enhancements included in the Package that Mercer had *not* performed an actuarial study of the cost of the BackDROP as allegedly suggested by Dobbert's October 25, 2000 memorandum addressed to the PSC. Had Mercer done so," Plaintiffs claim, "the backDROP would have been dead in the water."[20]

- That, when Mercer did do a cost analysis of the BackDROP in a January 16, 2001 letter to Dobbert, it negligently underestimated the cost of the benefit. Specifically, Plaintiffs claim that Mercer used unreasonable actuarial assumptions for the rate at which County employees would utilize the BackDROP, and the number of years they would choose to "drop back." Plaintiffs also claim that Mercer failed to consider that the BackDROP would cause County employees to retire earlier than they would have otherwise.[21]

- That, in enacting the Package, including the BackDROP, the County relied on certain statements by Soderstrom in the PSC hearing and in a prior June 8, 2000 letter allegedly "virtually guaranteeing" that the ERS would earn 12-13% investment returns over the next 35 years.[22]

### 5. Dobbert's Responsibility for the Development of the BackDROP

Before presenting the undisputed facts that dispel each of the Plaintiffs' allegations, it is important to recall a central fact – that Dobbert, the Human Resources Director for the County, and *not* Mercer, was responsible for the development and design of the BackDROP. As former County Executive, F. Thomas Ament ("Ament"), has testified:

---

[18] *See* Complaint, ¶¶ 63-92. The Plaintiffs also append as a separate "cause of action" a claim for punitive damages alleging that Mercer's conduct "constituted an intentional disregard of Plaintiffs' rights," including "the right to have their actuary discharge its duties professionally." *Id.*, ¶¶ 93-95.

[19] *See* Transcript, April 14, 2008 Hearing, pp. 57-58 (Mr. McNeil: "the facts will all be the same. It's not a matter of trimming the facts, it's the facts are all the same for each of these allegations").

[20] *See* Complaint, ¶¶ 39, 68(a), 72(a), 72(b), 72(f), 72(h), 72(i); *see also,* Complaint, ¶ 36 ("The PSC would not have voted for the package if it had known the truth.").

[21] *See* Complaint, ¶¶ 17, 19, 68(b), 68(d), 72(a).

[22] *See* Complaint, ¶¶ 14(c), 68(c), 72(c), 72(g).

> The one fact I think is a fact that everyone agrees on in that the development of the backDROP developed by [Dobbert]. I think as far as I know, everyone agrees that that's the case. I don't think anyone – if I did, I apologize. I didn't give the impression – meant to give the impression that Mercer developed the concept. I don't think that's true.

Other County employees, including Henry Zielinski ("Zielinski"), the County's former Director of Labor Relations, and Amerell, the former administrator of the ERS, also agree that Dobbert was the author of the BackDROP.[23]

As Dobbert himself described it to the Wisconsin Department of Justice:

> DOBBERT stated that he developed the BackDROP with minimal help from anyone.... DOBBERT stated that the Mercer actuarial firm did not help in the development of the BackDROP.

Dobbert re-confirmed these facts in his August 2007 deposition in this matter.[24]

More specifically, Dobbert admitted that he had *not* asked Mercer to do BackDROP cost calculations before his presentation to the PSC on October 27, 2000, and that the first time he asked Mercer for a BackDROP cost estimate was in December of 2000, *after* the benefit had been enacted for the County's attorneys and non-represented employees. Again, Dobbert re-confirmed all of these facts in his August 2007 deposition.[25]

Dobbert has offered varied explanations for why he failed to use Mercer:

- Dobbert did not request cost analyses because "he had a limited budget to spend on actuarial services," so "he tried to use Mercer as sparingly as possible."

- Dobbert waited so long to involve Mercer because "it was an incredibly horrendous period" in terms of his workload.

- Dobbert didn't use Mercer because he thought he had the necessary knowledge and experience to design the BackDROP himself, *i.e.*, because creating the BackDROP was "not rocket science, I just did it."

---

[23] PFF, ¶¶ 54-55.
[24] PFF, ¶ 56.
[25] PFF, ¶ 57.

Again, Dobbert confirmed these facts in his August 2007 deposition.[26]

Dobbert had, in fact, been considering a BackDROP for some time.   Many witnesses have confirmed that he got the idea for the BackDROP by attending a conference on the subject in the late 1990s.   Indeed, in January 1999, he commissioned and received a detailed memorandum from the Reinhart Boerner law firm regarding DROPs that mentions BackDROPs as a possible variation.   In that memorandum, Reinhart discussed plan design options for DROPs available to the County, told the County that their choice regarding a DROP could have cost implications, and told them that their choice could affect retirement patterns.[27]

Thus, when Dobbert considered a BackDROP for inclusion in the Package, he again turned to Reinhart.   On September 12, 2000, Dobbert sent a letter to Steven Huff ("Huff") of the Reinhart firm, describing the BackDROP in detail, and asking Huff to look for "red flags." Mercer, notably, was not copied on this letter.[28]

Then, in late October 2000, days before the PSC hearing at which the benefit enhancements included in the Package would be considered, Dobbert received a twenty-five page memorandum Reinhart attorneys had drafted discussing, among other things, "DROP design issues."  This memorandum, which concluded that "the County should wait to implement the expected amendments to ERS until the Pension Board receives a favorable determination letter from the Internal Revenue Service," was later called the "go-slow memo" by County representatives.  Huff told Dobbert that costing out the BackDROP benefit was "an area that needed to be addressed and that an actuary was needed."[29]

---

[26] PFF, ¶¶ 58-60
[27] PFF, ¶¶ 61-63.
[28] PFF, ¶¶ 64-65.
[29] PFF, ¶¶ 66-68.

**6.  The October 27, 2000 Pension Study Commission Hearing**

The October 27, 2000 PSC hearing is the main focus of Plaintiffs' case.   The irony of this focus is that, as the transcript of the hearing shows, there was literally no discussion whatsoever of the BackDROP.[30]

In preparation for the hearing, Dobbert had prepared a memorandum to the PSC describing the pension enhancements that would come before them for consideration as part of the Package.   The memorandum consists largely of a series of bullet-points detailing key benefit revisions to be included in the Package, including an increase to the multiplier for pension benefits for employees hired after 1982; and a "retention bonus" for pre-1982 hires of 7.5% for each year of service after January 1, 2001 to a maximum of 25%.[31]

Then, in conclusion, the memorandum appends the following cryptic language, which later became central to Dobbert's criminal prosecution, and is again the focus of Plaintiffs' case:

> The establishment of the "back drop" benefit and sick allowance pay out have minimal impact on the pension system.  The actuary has reviewed the cost of these benefit revisions and has provided the attached letter.

In the first sentence Dobbert first states that the BackDROP would have a "minimal impact."   In the second sentence, Dobbert refers to an "attached letter" from "the actuary" for the "cost of these benefit revisions," without defining the antecedent for "these" – either the "back drop and sick allowance pay out" benefits mentioned in the prior sentence, or the other, bullet-pointed benefits that the body of the memorandum had described.[32]

---

[30] PFF, ¶ 69.
[31] PFF, ¶¶ 70-71.
[32] PFF, ¶ 72.

The "attached letter" was a letter from Skelly of Mercer to Dobbert, dated October 3, 2000, which detailed the following costs for proposed pension enhancements:

| | Annual Cost |
|---|---|
| ■ Post-1982 Members | |
| — Increase multiplier by ½% for each year of future service and ½% for each eight past service years for each year of future service worked after 1/01/2001 | $4,584,000 |
| — Change vesting to 5 years effective 1/1/2001 | 449,000 |
| — Change final average salary to three-year average effective 1/1/2003 | 735,000 |
| ■ Pre-1982 Members | |
| — Increase final average salary by 7½ % for each year worked after 1/1/2001 to a maximum of 25% | 1,886,000 |
| **Total** | **$7,654,000** |

Mercer's letter to Dobbert detailed a $7,654,000 annual cost for proposed pension enhancements.  The pension enhancements listed in Mercer's letter are the precise benefits for which Dobbert had provided bullet-point descriptions in his memorandum, for the simple reason, noted above, that those benefits were the only benefits included whose cost Mercer had been asked to analyze at that time.   Thus, Mercer's October 3, 2000 letter to Dobbert does not mention the BackDROP at all.[33]

The premise of the Plaintiffs' claim, however, is that Mercer, seeing the Dobbert memorandum referencing a "minimal impact" for the BackDROP, juxtaposed with a reference to cost analyses from "the actuary," should have immediately realized that Dobbert was misrepresenting the facts, and "spoken up" to inform the PSC members that Mercer had, in fact, *not* been engaged to and, thus, had *not* yet performed any cost analysis for the BackDROP. Thus, Lynne DeBruin ("DeBruin"), one of three County Board members on the PSC, testified :

---

[33] PFF, ¶¶ 73-75

| Q | So let me just be very precise here. What is it that you think Mercer should have told the Pension Study Commission? |
|---|---|
| A | Mercer should have -- in that meeting the first thing they should have said, since they got the same documents that we did, and since they were the only two people in the entire room that knew that a study had not been performed, I believe they had a responsibility by their contract and by their professional background, their standards to inform the committee that a study had not been done.[34] |

Had Mercer done so, Plaintiffs contend, it would have corrected the "mistake" in Dobbert's memorandum and any misunderstanding by the PSC members, alerting them to the fact that the BackDROP was not necessarily "cost neutral," and the BackDROP would have been "dead in the water."[35]   Instead, Plaintiffs allege, the PSC members, supposedly relying on Dobbert's October 25th memo and Mercer's silence, believed that the BackDROP had no cost and that the costs of the entire set of pension enhancements included in the Package were limited to the $7.6 million annual cost detailed in Mercer's October 3rd letter.

### 7.    Dobbert Himself Understood That No Cost Analysis Had Been Performed By Mercer As Of The October 27, 2000 PSC Hearing.

Although Plaintiffs claim that Mercer should have told the PSC on October 27, 2000 that it had *not* performed a cost analysis of the BackDROP, an undisputed threshold fact is that *Dobbert himself* certainly knew that he had not at that point asked Mercer to do so:

| Q | And so -- but when you drafted this letter and when you presented it to the Pension Study Commission, you Gary Dobbert knew that Mercer had not in fact costed those two benefits at that point, correct? |
|---|---|
| A | Yes. |

***

| Q | Obviously if Mr. Skelly had said to you either in the hallway or even, you know, in the meeting itself, Gary, you know, |
|---|---|

---

[34] PFF, ¶ 76.
[35] *See* Complaint, ¶ 39.

> we don't know what you're talking about, we hadn't reviewed
> the sick pay benefit or the backDROP benefit cost, you --
> that was information you already knew, correct?
>
> A     I knew they hadn't reviewed it, yes. [36]

As Mercer will argue below, Dobbert's knowledge must be imputed to the County as a matter of

law.   Because Dobbert knew, the County knew, so there was nothing for Mercer to tell.

**8.     A Plain Reading of Dobbert's October 25, 2000 Memorandum and Mercer's October 3, 2000 Letter Shows That No Cost Analysis Had Been Done On The BackDROP By Mercer As Of October 27, 2000.**

A premise of the Plaintiffs' claim related to Mercer's "silence" at the October 27, 2000

PSC hearing is that the PSC members *necessarily* misunderstood Dobbert's October 25th

memorandum to mean that Mercer had costed out the BackDROP.   But Dobbert himself has

testified that he does not think the memorandum could reasonably be misunderstood that way:

> A     … And to be honest, I think anyone who looked at the
> document and the attachment would realize that seeing as
> there was no reference to the backDROP or the sick leave in
> the Mercer document attached, would realize that the
> backDROP and sick leave allotment had not been reviewed
> by Mercer.
>
>              ***
>
> Q     And you essentially are alluding to the point you just made,
> which is that you got the memo dated October 25.  It
> attaches a letter dated October 3.  Anyone looking at the two
> of them would realize that there hadn't been an actuarial
> study, correct?
>
> A     Yes.
>
>              ***
>
> Q     All right.  Although obvious to everyone in this room,
> perhaps to the jury by this point, the letter is incorrect in the
> last paragraph, where it refers to the actuary having reviewed
> the cost of these benefit revisions and has provided the
> attached letter, correct?

---

[36] PFF, ¶ 77.  Dobbert also was not the only County employee who knew that Mercer had not worked on the BackDROP in October 2000:  Amerell also testified that he spoke with Skelly prior to the October 2000 PSC hearing to ask him about the BackDROP and was told that Mercer was not involved with the BackDROP at all. PFF, ¶ 78.

| A | That's an unfortunate statement.  I did not mean to infer that, but I continue to believe that if you read this letter in conjunction with the actuary's October 3rd letter, you would realize that there had been no calculation done by the actuary on the backDROP or the sick leave.[37] |
|---|---|

Plaintiffs' claim against Mercer thus hinges on an allegation that Mercer should have "spoken up" to correct what at most was an *ambiguity* in Dobbert's October 25, 2000 memorandum that Dobbert himself does not even acknowledge.

## 9. The County Decisionmakers Did Not Rely On Mercer's Alleged Failure To Disclose That Mercer Had Not "Costed Out" The BackDROP As Of October 27, 2000, Because They Never Considered Mercer's Advice *At All.*

Most importantly:  although a necessary premise of the Plaintiffs' claim is that County decisionmakers – the County Board – misunderstood Dobbert's memorandum, and relied on Mercer's attached letter as the complete cost of the benefit enhancements, *there is no evidence that any of them even saw Mercer's October 3rd letter.*   For instance, DeBruin, who served on both the PSC and the County Board's Personnel Committee has testified that she never saw the October 3, 2000 letter until "after the scandal broke."[38]

More tellingly, Borkowski, who voted with the majority on the County Board to enact the Package and whose vote on the PSC was decisive in its 3-2 approval of the pension enhancements included in the Package, testified that he *never* saw the October 3, 2000 letter containing a cost of more than $7.6 million for the pension enhancements:

| Q. | Yeah.  We're looking at over 7 million bucks for just part of it for just one year. |
|---|---|
| A. | Yeah. |
| Q. | Would that have impacted your vote? |

---

[37] PFF, ¶ 79.

[38] PFF, ¶ 80.  Similarly, Derek Kenner ("Kenner"), one of the two non-County Board, "citizen"  members of the PSC, testified that he could not recall receiving *any* documents other than a notice of the meeting and "maybe some talking points" for the October 27, 2000 hearing, and wasn't even aware prior to the meeting that the county was considering making changes to the pension.  At the time of the meeting, Kenner candidly admits, he did not understand what the BackDROP meant or what it entailed, and does not recall any discussion of the benefit at the PSC hearing.  PFF, ¶¶ 81-82.

| | |
|---|---|
| A. | Yes. |
| Q. | Now as a PSC member or as a supervisor or as both? |
| A. | Both. |
| Q. | And the PSC you're saying didn't have this information, this Mercer information to whatever extent it looked at these proposed enhancements?... Did the Pension Study Commission have the memo that Dobbert wrote it regarding the ordinance revisions? Did it have this memo? |
| A. | I don't recall having this memo. All I can simply say is that I did not see $7.6 million. |
| Q. | And that 7.6 million is in the, quote, attached letter that the memo refers to; correct? |
| A. | Does the memo refer to it? |
| Q. | Yeah. That's just what I just read you. The actuaries reviewed the cost of these benefits provisions and has provided the attached letter. |
| A. | I know I didn't see the 7.6 million. |
| Q. | And you don't even know you saw this memo. Is that your testimony? |
| A. | That's correct. |

Elsewhere Borkowski emphasized that he did not see the October 25th Dobbert memorandum and the attached October 3rd Mercer letter because "I would remember if I saw a $7 million price tag on something." Instead, Borkowski testified that, prior to the PSC hearing in October 2000, he did not rely on any consultants, including actuarial consultants like Mercer, for information regarding the Package, but instead relied on department heads like Dobbert, Zielinski and Robert Ott ("Ott"), the County's Corporation Counsel.[39]

Similarly, James Schmitt ("Schmitt"), another member of the Personnel Committee, who voted with the majority to enact the Package, also testified that he had never seen Mercer's October 3, 2000 letter, and never knew of the $7.65 million cost Mercer had attributed to the other pension benefits that were changed in the Package even without the BackDROP.[40] Indeed, Schmitt testified that the PSC did not advise the county *at all* about the cost implications of *any* of the proposed pension changes, much less the BackDROP:

---

[39] PFF, ¶¶ 83-85.
[40] PFF, ¶ 86.

> Q.    … Did the Pension Study Commission advise the county
>        board as to the actuarial effect of the proposed pension
>        changes?
> A.     No.
> Q.     Okay.  Did the Pension Study Commission advise the
>        personnel committee of the actuarial effect of the proposed
>        pension changes?
> A.     Of the actuarial effect?
> Q.     Right.
> A.     No.
> Q.     Did the Pension Study Commission advise the county board
>        of the cost implications of the proposed pension changes?...
> A.     … the answer is no on all those.[41]

Supervisor Linda Ryan ("Ryan") agreed that all the Personnel Committee had to review about the Package when it voted on it in terms of written materials was a copy of the resolution. (Ryan also told the DOJ that she thought her role as a Supervisor was simply to "rubber stamp" whatever the Ament administration came up with in labor negotiations.) [42]

Supervisor Joseph Davis ("Davis") stated to the DOJ that the only material he received prior to the November 2000 County Board meeting at which the vote on the pension plan was taken was an agenda.[43]

Thus, there is no evidence that either the PSC or the Personnel Committee or the County Board as a whole ever saw Mercer's October 3, 2000 letter.   If they did not see it, they could not have been misled by it, and could not have relied on any "omission" by Mercer to correct that misunderstanding.

## 10.    Mercer's January 16, 2001 Cost Analysis of the BackDROP

Moving on to Plaintiffs' second allegation, as noted above, it is undisputed that Dobbert did not ask Mercer for a cost analysis of the BackDROP until late November or December of 2000.  Mercer provided its cost analysis via a letter to Dobbert dated January 16, 2001,

---

[41] PFF, ¶ 87.
[42] PFF, ¶¶ 88-89.
[43] PFF, ¶ 90.

calculating a $718,000 annual cost for the BackDROP. Dobbert admits that this annual cost was not "minimal." The letter also reiterated Mercer's cost estimates of more than $7.6 million for various other benefits proposed as part of the Package, including retention bonuses for employees hired both before and after 1982 that would be maximized in 2004 and 2003, respectively. [44]

In pertinent part, Mercer's January 16, 2001 letter reads as follows:

**Subject:    Updated Package of Pension Changes**

Dear Gary:

Enclosed is updated information as to the cost of the following combination of proposed pension changes. We have added the cost of the Back DROP benefit to the previous results. The costs are based on the census and valuation for the year 2000. The changes include all employees in the system except deputy sheriffs.

|  | Annual Cost |
|---|---|
| ▪ Post-1982 Members | |
| – Increase multiplier by ½% for each year of future service and ½% for each eight past service years for each year of future service worked after 1/01/2001 | $4,584,000 |
| – Change vesting to 5 years effective 1/1/2001 | 449,000 |
| – Change final average salary to three-year average effective 1/1/2003 | 735,000 |
| ▪ Pre-1982 Members | |
| – Increase final average salary by 7½ % for each year worked after 1/1/2001 to a maximum of 25% | 1,886,000 |
| ▪ Back DROP benefit | 718,000 |
| **Total** | **$8,372,000** |

In arriving at its annual cost estimate, Mercer applied assumptions about the number of County retirees who would elect the BackDROP, and the number of years they would "drop back," assumptions which were fully disclosed in the letter[45]:

[44] PFF, ¶¶ 91-93.
[45] PFF, ¶ 94.

> The Back DROP cost was calculated under the following assumptions:
>
> - 25% of retirees will utilize the Back DROP pension.
>
> - Those electing the Back DROP will go back up to three years, but not earlier than eligibility for unreduced benefits.

Mercer also informed Dobbert in the letter that, because of poor market returns in 2000, the ERS might no longer be fully funded; that "it is quite likely that the contribution requirements calculated in 2001 will not be zero"; that, when the County's contribution to the ERS became non-zero, it would increase annually by $8,372,000; and that this contribution would remain in place for 35 years and would escalate each year to reflect salary increases.[46]

## 11. The County Decisionmakers Did Not Rely On Mercer's January 16, 2001 Cost Analysis of the BackDROP, Because They Never Saw It.

Plaintiffs allege that the cost analysis of the BackDROP benefit included in Mercer's January 16, 2001 letter was negligent, because it underestimated the rate of utilization of the benefit by County employees upon retirement and the years they would drop back, and because it failed to take into account the incentive Plaintiffs claim would be created by the BackDROP for employees to retire earlier than they otherwise would have. Like their first allegation, however, Plaintiffs' second allegation also fails because the undisputed facts show that the decisionmakers at the County did not rely on the January 16, 2001 letter, because they simply never saw it.

---

[46] PFF, ¶¶ 95-97.

Indeed, it was one of the central conclusions of the County's own April 2002 Audit of the Development and Adoption of the 2001-2004 Wage and Benefit Package (the "April 2002 Audit") that Dobbert had failed to pass along the letter to County decisionmakers[47]:

> Further, it appears this information was not formally communicated to the County Board. According to County Board Research staff, their first indication of a cost associated with the back DROP benefit came as they gathered information for an issue paper released in December 2001.

In his deposition in July 2007, Jerome Heer ("Heer"), the Director of the County's Department of Audit, confirmed the conclusion of the April 2002 Audit that the County Board's staff's "first indication of a cost associated with the backDROP benefit came as they gathered information for an issue paper released in December of 2001." Heer further had no evidence that County supervisors had *ever* received the cost information in the January 16, 2001 letter.[48]

For instance, DeBruin has repeatedly testified that the letter was never provided to the County Board prior to the DC 48 contract. DeBruin testified about the significance of this failure by Dobbert to pass on the letter:

> Q.    Now I want to go back and just complete the chronology that you set forth in your timeline, Exhibit 108. Now I note that you have an entry for January 16, 2001, a letter from Skelly to Dobbert on backdrop costs, and following it is significant because it showed that the strategy of no cost pension enhancements was not accurate. Is that an accurate assessment of your belief as to the significance of the failure to cost the backdrop?
>
> A.    I wrote this, and that's my assessment of why it would be significant to me as the finance chairman, because it would have shown, it would have been proof that Mr. Dobbert's assertions were not accurate, and then I would have,

---

[47] PFF, ¶ 98.
[48] PFF, ¶¶ 99-100.

following my, what I would normally do in that situation, then ordered an indepth review of the fiscal assertions. I already had disputed with Mr. Dobbert some of his underlying assumptions, and so the two combined would have been reviewed. *I did not receive that letter at that time. This is the chronology that I put together, like I said, once the scandal broke and I found out about this letter.*[49]

Similarly, Ament has testified that he could not recall seeing Mercer's January 16, 2001 letter prior to the February 15, 2001 vote on the Package for DC 48. Plaintiffs' main expert witnesses also could not identify anyone at the County other than Dobbert who had seen Mercer's January 16, 2001 letter.[50]

## 12. The Cost Information Contained In Mercer's January 16, 2001 Letter Was Not Included In A Revised "Fiscal Note" For The Package.

Under section 1.10 of the Milwaukee County General Ordinances, every ordinance submitted to the Milwaukee County Board of Supervisors for enactment must be accompanied by a "fiscal note" addressing the financial implications of the proposal:

No resolution, ordinance or communication from any county officer, board or commission shall be considered by the county board, or by any committee thereof to which it has been referred, unless it shall have attached as a note a reliable estimate of the fiscal effect or absence of the same. The fiscal note shall be prepared on a form approved by the committee on finance and supplied by the department of administration. *With respect to any collective bargaining agreement, any amendment to chapter 17 of the general ordinances affecting wages or benefits, or any other action affecting the wages or benefits of county employees, the fiscal note shall include as much information as is practicable under the circumstances about the fiscal impact upon each department affected by the action. In addition, at minimum, the fiscal note shall set forth details of the projected annual countywide fiscal impact projected for each year of the collective bargaining agreement or, in the case of any other action affecting the wages or benefits of county employees, shall contain information regarding the projected fiscal impact at least five (5) years into the future.* When necessary, affected agencies shall

---

[49] PFF, ¶¶ 101-102.
[50] PFF, ¶¶ 103-104.

assist the author in preparation of the fiscal note. If a member
objects to the content of a fiscal note attached to a resolution or
ordinance under consideration by the county board, such
resolution or ordinance shall, upon the affirmative vote of a
majority of the members present and voting, be referred to the
county board staff for a review and report to the county board at
its next meeting.[51]

The purpose of the "fiscal note," as stated in the County's Administrative Manual, is to "allow[]

the Board, committee members, the County Executive, and County administrative departments

to see at a glance where the major fiscal changes will take place, and give[] reviewing agencies

sufficient data to initiate a meaningful fiscal analysis, if requested."[52]

Thus, as the uniform testimony from County personnel involved in the passage of the

BackDROP confirms, when County Supervisors look for information on the financial

implications of a particular ordinance to rely on in making their decisions, they look at the

ordinance's fiscal note. Ament also confirmed that supervisors typically looked at the fiscal

note for an ordinance for information about its cost and financial consequences.[53]

It was no different with regard to the ordinance enacting the Package that included the

BackDROP. DeBruin has testified that "[t] o the extent that we would have been informed of

[the financial impact], it would have been in the fiscal note on the resolution before us. I don't

believe any member of the board… was specifically requesting additional information, other

than the fiscal note." Supervisor John Weishan also testified that he had relied on the fiscal note

---

[51] Milwaukee County General Ordinances, § 1.10(1). The highlighted portion of MCGO § 1.10(1) cited above was
added to the ordinance after the controversy over the Package erupted in 2002. In part, it was a response to a
September 2002 review by the Wisconsin Legislative Audit Bureau, which, in a discussion of "potential areas for
further efficiencies," noted that "Milwaukee County does not produce or distribute general policy guidelines on how
to draft an effective fiscal note." In addition, on February 25, 2003, the Greater Milwaukee Committee's Select
Committee on Milwaukee County Government also submitted a review in which it criticized the County's historical
practices for fiscal notes. PFF, ¶¶ 105-106.
[52] PFF, ¶ 107.
[53] PFF, ¶¶ 108-109.

for the Package for information on the "cost implications" of the Package.[54]

Similarly, Borkowski, whose vote at the October 27, 2000 PSC hearing was decisive, testified that the *only* information he considered regarding the cost of the pension enhancements was the fiscal note. As Borkowski put it, "[a]s far as county government is concerned, my costing out is the fiscal note." "For me," Borkowski testified, "the fiscal note on the resolution is what salted my vote."[55]

Borkowski further testified:

> Q. What were you specifically told about the cost of the ordinance amendments when you were first considering them? I mean, I use the term cost neutral, but what were you told, that you recall?
>
> A. Well, I don't necessarily recall the specific statements that were made. However, at the end of an 18-page resolution, as there are with any resolution, there is a fiscal note, and so that fiscal note, in essence, summarizes all of the financial details that went on, for whatever that resolution is. And so my point is, I took a look at that specific fiscal note, and in my eyes and my mind felt that it was clearly affordable to Milwaukee County.
>
> Q. Who would have been responsible for preparing that fiscal note?
>
> A. Well, you know, who would be responsible? I would imagine Gary Dobbert.[56]

It is undisputed that Dobbert did *not* revise the "fiscal note" accompanying the resolution to enact the Package to reflect the BackDROP's annual cost of $718,000 calculated by Mercer in its January 16, 2001 letter.[57] Again, this was a central conclusion of the April 2002 Audit[58]:

---

[54] PFF, ¶¶ 110-111.
[55] PFF, ¶¶ 112-114.
[56] PFF, ¶¶ 115-116.
[57] PFF, ¶ 117.
[58] PFF, ¶ 118.

<div style="border:1px solid black; padding:1em;">

<u>Back DROP</u>

In what may have been, in retrospect, the most significant omission from the fiscal notes for the wage and benefit package, there was no fiscal impact attached to the controversial back DROP benefit. None of the actual fiscal notes accompanying the 15 resolutions implementing the 2001—2004 wage and benefit package referenced the back DROP provision in any way.

</div>

Indeed, the "crux of the report," according to Heer, was "the weakness of the fiscal note attached to the pension ordinance at the time it was presented to the County Board." Heer described the fiscal note as "incredibly weak" and the "worst he has ever seen," including "numerous errors and omissions… from 'small math to big logic.'" Heer called it a "lousy fiscal note."[59]

A March 2003 County analysis also noted that "it is the responsibility of the elected County Supervisor to formally object to the content of a fiscal note. This policy is predicated on the notion that those who are empowered to vote on a policy issue should ultimately determine whether they possess sufficient financial information to make an informed vote."[60]

Dobbert has admitted that he drafted the fiscal note for the ordinance enacting the BackDROP himself. DeBruin testified that Dobbert *should* have included the cost information on the BackDROP contained in Mercer's January 16, 2001 letter in the fiscal note for the Package "to alert the board of the new estimates." Heer told the DOJ that, in his view, Dobbert probably did not revise the fiscal note for the Package to include the cost of the BackDROP because he didn't want to call attention to the "shoddy" quality of the fiscal note he had

---

[59] PFF, ¶¶ 119-121. In *Dunn et al. v. Milwaukee County*, the Court's October 1, 2003 Order granting the County summary judgment adopted as a finding of fact the conclusion of the Audit that "[t]here are no procedures for the development of fiscal notes" at the County. PFF, ¶ 122.
[60] PFF, ¶ 123.

drafted.[61]

In any event, the key fact remains undisputed – the information contained in Mercer's January 16, 2001 letter to Dobbert presenting a $718,000 annual cost for the BackDROP, increasing every year over 35 years, was *never* included in the fiscal note presented to the County Board of Supervisors, the ultimate decisionmakers whose role was to decide whether or not to extend the Package to the County's largest union, DC 48, in a contract that would not be enacted until February 15, 2001.

Again, they could not have relied on information they never received.

### 13. Soderstrom's June 8, 2000 Letter to Dobbert About the ERS' Historical Investment Returns.

Plaintiffs also have advanced the outlandish claim that Glenn Soderstrom "virtually guaranteed" that the County could rely on the ERS earning investment returns of 12-13% annually indefinitely.

Soderstrom's supposed "guarantees" were made, according to the Complaint, on two occasions, in a June 8, 2000 letter to Dobbert, and in extemporaneous comments he made to the PSC at the October 27, 2000 hearing.[62]   In pertinent part, the June 8th letter[63] says:

> While past performance is not a guarantee of future performance, we see that average returns have been consistently 11.6% or better. Thus, we believe the five-year projection we provided based on a 12% annual return is appropriate for planning purposes.
>
> Of course, you must recognize interim volatility is not only a probability but almost a certainty. We still expect relative "spikes and valleys" to occur. We believe, though, that by the end of this five-year period, projected results will not be hugely different from actual results.

---

[61] PFF, ¶¶ 124-126.
[62] *See* Complaint, ¶¶ 72(d), 72(g).
[63] PFF, ¶¶ 127-128.

Mercer here was responding to a request from County Executive Ament, who had wanted to know "what's the impact of these things going to be, you know, over the next five – five years or so if the plan has zero percentage increase or if it earns five percent or ten percent. I mean what – how is that going to impact the dollar amount that we have to contribute."[64]

But Mercer's analysis is qualified by an express caveat – that "past performance is not a guarantee of future results," because "interim volatility is not only a probability, but almost a certainty." This is the precise type of caveat that is commonplace in investment performance reporting by portfolio managers. Indeed, it is a caveat that the Plaintiffs would have been familiar with, as shown in the Pension Board's standard contract with its portfolio managers, which has for many years included the following language: "The Board recognizes that risk is inherent in any investment in securities and that the Manager *cannot guarantee* any level of return on the Assets." This investment manager contract is a thirteen-page document with recitals and specific agreements detailed, signed by the parties.[65] Yet, Plaintiffs are strangely (and unreasonably) interpreting as a "guarantee" of future investment results a two-page letter from Mercer that says in very common language that it is "*not* a guarantee of future results."

But, of course, neither Ament nor Dobbert have testified that they realistically viewed Soderstrom's letter as a "guarantee" of anything, or relied on it as such. In his deposition, Ament testified as follows:

> Q      Okay. My question was really at this time did you believe
> that Mercer was somehow guaranteeing that performance?

---

[64] PFF, ¶ 129. Three days earlier, Mercer had provided Dobbert a letter attaching multiple charts showing the County's projected contribution if, over a five-year period, the ERS earned 0%, 5%, 8.5% or 12% investment returns. PFF, ¶ 130.

[65] PFF, ¶ 131. Reports from ERS investment managers also routinely contain disclaimers stating that "[p]ast performance does not guarantee future results, which will vary." PFF, ¶ 132.

> A    Guaranteeing is a -- is a strange word.  Guaranteeing --
> rather than using the word guarantee, I would express it
> this way:  They're saying based on everything before them,
> their expertise and what they're looking at, this is what
> they expect.  Is that going to be 100 percent accurate?
> Probably not, but it should be in the ballpark.
>
> Q    Right.  I mean, in the ballpark over a long period of time
> perhaps.  But you understood, didn't you… that there
> might be -- at any point could be a down year in the
> market or several down years?
>
> THE WITNESS:  I think everyone understands that in a particular
> year you can have a down year.[66]

Meanwhile, Dobbert testified that he understood at all times that the investment return assumption Mercer was using in its formal annual valuation reports for the ERS was 8.5%, not 12% or 13%.  Dobbert went on as follows:

> Q    And you noted of course that -- in the last paragraph he
> says, "Of course you must recognize interim volatility is
> not only a probability but almost a certainty. We still
> expect relative spikes and valleys to occur."  That wasn't
> telling you something you  didn't already know, is it?
>
> A    You're correct.[67]

Indeed, County representatives have uniformly acknowledged the stock market's inherent unpredictability.   Thus, Supervisor Michael Mayo ("Mayo") testified that "when you look at the history you know there are going be to [sic] lows, ups and downs in the market.  *Nobody thought we would be in the market four years down at the present moment."*  And Borkowski, when asked about Mercer's advice, testified that "[Mercer was] making some suppositions. They did not suppose in the mid-nineties the market was going to go as crazy as it did.  So, you know, you take this stuff with a grain of salt.  All right.  *Just because somebody says something, they don't have a crystal ball.*  They don't actually know what's going to happen."[68]

---

[66] PFF, ¶ 133.
[67] PFF, ¶¶ 134-135.
[68] PFF, ¶¶ 136-137.

In fact, the Plaintiffs have repeatedly taken the position in earlier lawsuits, contrary to their position here, that they were fully aware of the fact that "the annual contributions that Milwaukee County makes to the ERS may vary widely. For example, if investment income is greater than expected, the amount of Milwaukee County's annual contribution will decrease (all other factors being equal)." Thus, "[t]he contribution Milwaukee County makes to the ERS each year fluctuates based upon complex factors, including… investment performance…. these complex factors… are constantly in a state of flux."[69]

Although not germane to the present motion, which focuses only on the narrow question of reliance, it is worth noting that a predicate of the Plaintiffs' claim with regard to Soderstrom's "guarantee" is, of course, that his prediction was *false*. Yet the latest "Flash Report" for the ERS' investment returns dated shows that the ERS has earned 12.3% over the most recent five years from April 2003 through April 2008. During that period – and many others – Soderstrom's "guarantee" would have been entirely accurate.[70]

**14. Soderstrom's Comments on Investment Returns at the October 27, 2000 Pension Study Commission Hearing**

With regard to Soderstrom's comments on investment return at the October 27, 2000 PSC hearing, again, reviewing the *complete* sets of comments in context is important.

The first Soderstrom comment was in response to a question from Supervisor Robert Krug ("Krug"), who noted his concern about the possibility that "after the first couple of years, our cash contributions to the pension fund may be climbing dramatically."[71] Before Soderstrom answered, however, Skelly of Mercer spoke first:

---

[69] PFF, ¶ 138.
[70] PFF, ¶ 139.
[71] PFF, ¶ 140.

> The key factor is what the actual investment retirement fund turns out to be, so we looked at what happens if the fund has a poor rate of return or it has the 8.5% we expect it's going to have in the long term; or, if it makes 12% as it has in the recent 10 or 20 year period. Depending on which of those occurs, that has a dramatic impact on contributions that are required for the plan. The fact that some benefits could be increased with the proposal that you are looking at means that if the plan does come into a contribution requirement quickly because investment return isn't spectacular or isn't as high as it could be, then those contributions will be higher. But, if investment return continues to be very good, then it may well be that the contribution will still be "no contribution on the part of the employer." It is really that investment return that is the key variable and long-term, we can predict that fairly well; in the short term it is not possible to predict.

Thus, before Soderstrom even spoke to the PSC, Skelly had drawn attention to the variability of investment returns and their "dramatic impact" on the County's contributions to the ERS, noting that "in the short term it is not possible to predict." [72]

Here, then, are Soderstrom's first set of comments on investment return to the PSC:

> But as Dennis said, there is nothing that we can do to guarantee you that you will not have a contribution because I cannot say that the markets are not going to loose 25% in value by the end of the year. Nor can I say that the markets will not increase by 25% in value before the end of the year; we have made our estimates and we have given some sensitivity to analyses. I will tell you that one fact I do know is that since the depression, equities have returned approximately 10.5% per year on a compound basis. But, in any one given year, they could be up or down. We are assuming 8.5% right now. If you accept the fact that 10.5% is realistic, and I am sure Garret can comment on some of that with his expertise, you may not be experiencing a contribution in the future. But, if you have a period of time such as the 70's or late 60's where the equity market was black for a number of years, there could be a contribution which evolves. I wish I knew because I bet my mortgage on it, but at this point in time, we give you some degree of sensitivity and have said, "If this is what it is, here is what you are going to get and let you make your best-informed decision." Have we danced around your issue sufficiently, or have we lost you entirely?

---

[72] PFF, ¶ 141.

Contrary to Plaintiffs' allegations, Soderstrom is specifically *not* saying that Mercer is "guaranteeing" investment returns of the ERS, but the opposite – literally the first thing out of his mouth is his comment that "there is *nothing* we can do to guarantee you that you will not have a contribution because I cannot say that the markets are not going to loose [sic] 25% in value by the end of the year."   Soderstrom goes on to note the truism that, as shown above, County representatives like Ament, Dobbert, Mayo and Borkowski already knew, that "in any one given year, they could be up or down."[73]

Soderstrom's second set of comments to the PSC regarding the ERS' expected investment returns were as follows:

I feel comfortable saying with a fair degree of certainty that we will never go from zero to 20 million in one year, but you may go from zero to 4 or 5 million to 8 million to 13 million to 20 million over a five-year period if you have five years of flat-asset performance.  There is a possibility of that because all you have to do is pretend we are in the 1970 to 1974 market. Conversely, there is a possibility that if I look at the period of time from 1990 to 1995, you will be all zeros.  There is some degree of uncertainty, but I am convinced I will never come to you and tell you, "Supervisor, please pony up $20 million next year."  You would have the right to kick me in the rear end on that account because I think we would have warned you about the potential and surprises.  Nevertheless, there is a possibility that you could have a 2 or 3 or 4 million dollar impact in a given year as an increase and even that, I believe, would have, I believe, a significant impact on your budget process.

Here, again, Soderstrom was not "guaranteeing" that the County would have any particular level of contributions to the ERS based on a particular investment return.   To the contrary, all Soderstrom states are various "possibilities" – that the County's contributions to the ERS could be "all zeros" if the ERS earns investment returns similar to those earned in the 1990s; or that the

---

[73] PFF, ¶¶ 142-143.

County's contributions could increase to $20 million dollars a year "if you have five years of flat asset performance" as occurred in the early 1970s.[74]

As it turned out, the County's contributions by 2005 had increased to more than $30 million, but only because the ERS' investment returns had been less than "flat" – indeed, as the ERS' 2006 Annual Report reflect, the ERS had *negative* returns in 2000, 2001 and 2002.  It is also noteworthy that the County's contributions to the ERS in the mid-1990s had been in the range of $18 to 20 million a year.  Just prior to Soderstrom's comments, in fact, Supervisor Krug had commented that "[i]t's only four or five years ago… that we were putting about $20 million in cash tax levy into the pension fund.  Now we are down to virtually zero.  We don't want to go back to $20 million; we don't want to have a jump of $10 million in one year." Meanwhile, the County's contributions to the ERS in the early 1980s had been over $30 million a year, which Ament admitted would be greater than current contributions in 2007 if considered on a constant dollar basis.[75]

Soderstrom's next comment to the PSC was as follows:

> At the same time, it could go up; statistically, again, I think Garret would be able to tell you.  The investment cycles usually end on a five-year basis with one down year for every five years that you have.  Over the recent 10-year period you have had a couple of down years and several up years, fairly consistent in that nature.  In any given year, I could come to you and say, "Supervisor, we need $3 million next year if you are going to maintain the funding."  The following year I could say we were back to zero again because the assets rebounded back.  Ancient history, 1973 and 1974, were very bad years for the market, but by 1976 and 1977 we had recaptured all the dollars that we had lost at that point in time.  So you may have, and you will have, periodic blips that come through on your radar screen and there is limited amounts that I can do to prevent them, but I don't believe that the proposal, as presented, would give you a long-term spike or significantly raise the plateau.

---

[74] PFF, ¶ 144.
[75] PFF, ¶¶ 145-149.

Again, Soderstrom is advising the PSC members about possibilities, not guarantees – that the County's contributions to the ERS "could go up," because of the inevitability of a "couple of down years," or could be "back to zero again because the assets rebounded back."   Although recent investment history for the ERS has been good, Soderstrom comments, there will always be "periodic blips that come through on your radar screen *and there is [sic] limited amounts that I can do to prevent them.*"[76]

Soderstrom was next asked to identify the "break even" point where investment returns would obviate the necessity for any contribution to the ERS.   Soderstrom responded as follows:

Blame the numbers on me because that is part of my job to forecast sensitivity numbers; to say, "What if the fund earns 0% for the next five years; what if it earns 5%, 10%, 11% or 12% (I don't remember exactly what the numbers were), but we did some numbers.  If it earns exactly 8.5% for that period of time, yes, you will have some contributions that will be needed.  If it earns 12%, I believe all the contributions go away.  It is somewhere around the 10.5 to 11% that is break-even.  All we did is play with the asset side of the model; we did not do anything with the liability side, which, again, assumes 5.5% in pay increases.  If that is overly aggressive as far as pay increases, you have some softening effect on that, as well.  The bottom line is somewhere around, I'll say 11% (but please don't block the 11% in as an absolute number) but that is about what it would take to break even.  We did a rate-of-return charge for the County for the last 20 years, I think, and the County during that time has averaged about (the number that sticks in my mind is) 13.65, right around 13.5%.

Again, Soderstrom here is simply reporting historical data and projecting possibilities for the future – the same "what if" scenarios presented to Dobbert and Ament in June 2000 of 0%, 5%, 8.5% and 12% returns.[77]

---

[76] PFF, ¶¶ 150-151.
[77] PFF, ¶¶ 152-153.

Finally, Soderstrom was asked by DeBruin whether he was predicting 20% or more returns for the next few years. Soderstrom's response is telling: "I have training and qualification, *but I would say I cannot do that*. I am not an attorney and not an investment advisor. I am very good at running liability numbers, but as far as projecting on assets…."[78]

Notably, there is nothing in the record of the PSC hearing that suggests that members of the PSC understood that Soderstrom or Mercer were "guaranteeing" future performance or low County contributions indefinitely. Krug – who voted against the pension enhancements as a member of the PSC – noted that "if you get a flat market like you are describing in the 70's or 60's, then you have to take your losses." Similarly, Kenner commented that "[i]t is highly unlikely, somewhat unrealistic, that we will never have to increase the tax levy as far as pension contribution is concerned."[79]

There is also no evidence that Soderstrom's comments were relayed to the Personnel Committee or the County Board itself, or that his comments informed anyone's votes on the pension enhancements, much less the votes of a *majority* needed to pass the Package. Indeed, the transcript of the PSC hearing was not even available to them, since it was not transcribed from the clerk's tape until January 2002, after newspaper stories about the BackDROP had begun to appear. Meanwhile, DeBruin was the only member of the PSC who was also on the Personnel Committee, and she voted *against* the Package on both occasions. [80]

---

[78] PFF, ¶¶ 154-155.
[79] PFF, ¶¶ 156-158.
[80] PFF, ¶¶ 159-161.

# ARGUMENT

## I.  SUMMARY JUDGMENT STANDARD

To prevail on this motion, Mercer must show that there is no genuine issue as to any material fact and that it is therefore entitled to summary judgment as a matter of law.[81]  The Court must construe the evidence presented on Mercer's motion in favor of the Plaintiffs as the non-moving parties and give the Plaintiffs the benefit of all favorable inferences that can be drawn from it.   However, summary judgment must be entered against the Plaintiffs if they fail to make a showing sufficient to establish the existence of an element essential to their case, and on which they bear the burden of proof at trial.[82]

With regard to elements essential to their claims, the Plaintiffs may not simply rest on their pleadings.   They must affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial.[83]   The Plaintiffs must do more than show that there is "some metaphysical doubt as to the material facts."  Where the record taken as a whole could not lead a rational trier of fact to find for the Plaintiffs, there is no genuine issue for trial.[84]

## II.  MERCER IS NOT LIABLE BECAUSE PLAINTIFFS' CANNOT SHOW THAT THEY RELIED ON MERCER'S ADVICE.

### A.  Reliance Is A Necessary Element Of All Of Plaintiffs' Claims.

Because the main thrust of Mercer's motion for summary judgment focuses on the fact that Plaintiffs' cannot show that they relied to their detriment on anything Mercer did or did not advise them about the BackDROP's costs, the legal principles supporting Mercer's motion are relatively straightforward.   Such reliance, in one form or another, is a necessary element of all

---

[81] *Anderson v. Liberty Lobby,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
[82] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).
[83] *Id.*
[84] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

four of Plaintiffs' substantive causes of action for professional negligence, intentional misrepresentation, negligent misrepresentation and breach of contact.

First, with regard to Plaintiffs' professional negligence claim, Wisconsin has adopted the Restatement (Second) of Torts § 552, which provides in relevant part:

> § 552.  Information Negligently Supplied for the Guidance of Others.
>
>  (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.[85]

Thus, a professional negligence claim against an actuarial consultant like Mercer whose profession involves providing information for the guidance of others necessarily requires proof that the consumer of that information relied on it, and that his or her reliance was justified.

Second, with regard to Plaintiffs' intentional misrepresentation claim, it is black letter law in Wisconsin that an intentional misrepresentation cause of action also requires the plaintiff to have justifiably relied on an intentional  misrepresentation by the defendant:

> The elements of intentional misrepresentation are that: (1) the defendant made a representation of fact; (2) the representation was false; (3) the defendant made the representation knowing it was untrue or recklessly without caring whether it was true or untrue; (4) the representation was intended to deceive and induce the plaintiff to act upon it; and (5) the plaintiff believed the representation to be true *and justifiably relied on it* to his or her pecuniary damage.[86]

---

[85] Restatement (Second) of Torts, § 552 (emphasis added); *see also, Citizens State Bank v. Timm, Schmidt & Co.,* 335 N.W.2d 361 (Wis. 1983).

[86] *See* WIS JI-CIVIL 2401; *see also, Tietsworth v. Harley-Davidson, Inc.,* 2004 WI 32, ¶ 13, 270 Wis.2d 146, 677 N.W.2d 233.

Further, failure to disclose a material fact may be misrepresentation if the nondisclosing party has a duty to disclose that fact. [87]

Third, Plaintiffs' negligent misrepresentation claim is also governed by the Restatement (Second) of Torts, § 552, which Wisconsin has adopted, and which holds that negligent misrepresentation claims based upon advice from a professional require "justifiable reliance" by the plaintiff. [88] The very recent Wisconsin Supreme Court case of *Novell v. Migliacco* confirms that "justifiable reliance" is an element of all common law misrepresentation claims.[89] Moreover, Wisconsin law also "requires men in their dealing with each other, to exercise proper vigilance and apply their attention to those particulars which may be supposed to be within the reach of their observation and judgment, and not close their eyes to the means of information accessible to them."[90] This formulation is tantamount to a requirement that parties like the County who hire consultants like Mercer are not thereby absolved of their responsibility to exercise their independent judgment and common sense in making decisions.

It is true that the elements of Plaintiffs' fourth cause of action for breach of contract ordinarily do not include reliance. Causation, however, *is* an element of a breach of contract claim. But causation here necessarily requires reliance, because, absent reliance on Mercer's advice to their detriment, Mercer's advice could not have caused anything.[91] Notably, under

---

[87] *See Ollerman v. O'Rourke*, 288 N.W.2d 95 (Wis. 1980).
[88] *See* WIS JI-CIVIL 2403 (emphasis added).
[89] ____ N.W.2d ___ , 2008 WL 2185987 at ¶ 46 (Wis., May 28, 2008). In *Lambert v.Hein,* 582 N.W.2d 84, 92 (Wis.App.1998) , the Wisconsin Court of Appeals had reached a similar result, noting that a claim based on negligent misrepresentation "inquires whether the buyer was negligent in relying upon the representation."
[90] *See, e.g., Kanack v. Kremski,* 291 N.W.2d 864, 867 (Wis. 1980).
[91] In this context, it is worth recalling that the breach of contract alleged by Plaintiffs is based on the same facts as the Plaintiffs' misrepresentation and professional negligence claims. *See, e.g.,* Complaint, ¶¶ 87-92. The allegations supporting the Plaintiffs' breach of contract claim simply incorporate by reference all of the allegations supporting their other claims against Mercer.

Wisconsin law, reliance on a misrepresentation is equivalent to a causation element.[92]  Thus, in the recent Wisconsin Court of Appeals case of *Malzewski v. Rapkin*, the Court dismissed both breach of contract and misrepresentation claims because the buyer of a home had not justifiably relied on statements by the seller.[93]

It also should go without saying that for each claim plaintiffs must show *actual* reliance; constructive reliance will not support a claim.   Thus, the Wisconsin pattern jury instructions add that "[r]epresentations are to be tested by their actual influence on the person to whom made [not upon the probable effect of such representation upon some other person]."[94]   As stated in the Restatement (Second) of Torts, § 537, "the recipient of a fraudulent misrepresentation can recover from the maker for his pecuniary loss only if he *in fact* relies upon the misrepresentation in acting or in refraining from action."[95]

In sum, if Plaintiffs cannot produce any evidence that they actually and justifiably relied on Mercer's advice, *all* of their claims fail.   As shown above and highlighted below, the undisputed evidence does, in fact, demonstrate that the County did not actually rely on anything Mercer did or didn't do in connection with the enactment of the BackDROP.   And, even if they had, their reliance was not justifiable.

---

[92] *See, e.g., Ramsden v. Farm Credit Services of North Cent. Wisconsin ACA*, 90 N.W.2d 1 (Wis.App. 1998)("Reliance, in a negligent misrepresentation claim, is equivalent to the causation element.").
[93] 296 Wis.2d 98, 723 N.W.2d 156 (Wis.App. 2006).
[94] *See* WIS JI-CIVIL 2401 (brackets in original).
[95] Wisconsin has adopted the Restatement (Second) of Torts, § 537, in *Ollerman*, 288 N.W.2d 95; *see also,* Restatement (Second) of Torts, § 546, comment a ("If the misrepresentation has not in fact been relied upon by the recipient in entering into a transaction in which he suffers pecuniary loss, the misrepresentation is not in fact a cause of the loss"); *Learjet v. Spenlinhauer,* 707 F.Supp. 44, 48 (D.Me. 1989)(court could find no liability in fraud where misrepresentations were in no way relayed to or relied on by the claimant).

**B.** **Mercer Is Not Liable To The County For Failing To Inform The County At The October 27, 2000 Pension Study Commission Hearing That Mercer Had Not Performed A Cost Analysis Of The BackDROP.**

> **1.** **The Plaintiffs cannot show "actual reliance" on anything Mercer said or failed to say at the October 27, 2000 Pension Study Commission hearing in enacting the BackDROP pension benefit.**

As shown above, the County did not rely *at all* on Mercer's silence at the PSC hearing on October 27, 2000. Under Plaintiffs' theory, Mercer should have interrupted the PSC hearing to inform the members that Dobbert's October 25, 2000 memorandum, taken together with Mercer's attached October 3, 2000 letter, had incorrectly suggested that "the actuary" had analyzed the cost of the BackDROP and concluded that the cost was "minimal" or "cost-neutral." But none of the five members of the PSC has testified that he or she could recall seeing Dobbert's memorandum or Mercer's letter. And Borkowski, whose vote was decisive, has testified affirmatively that he never even saw the $7.6 million cost of the non-BackDROP benefits contained in Mercer's letter and, had he done so, it would have impacted his vote. Other members of the County Board's Personnel Committee like DeBruin, Schmitt, and Ryan, as well as County Board member Davis, have also all testified that they did not see Mercer's October 3rd letter prior to their vote.

Because County Board members never saw Mercer's October 3rd letter or Dobbert's October 25th memorandum, the County cannot demonstrate that it was misled into thinking that Mercer had provided a cost analysis of the BackDROP. Thus, Mercer's failure to "speak up" is a non sequitur, because the PSC members were not operating under any misconception that Mercer could have corrected, but instead voted for or against the Package for reasons entirely separate from the question of whether an actuary had "costed out" the BackDROP.

Indeed, as Borkowski testified, he did not rely on Mercer or any other consultant at all, but instead simply relied on information he had received at an earlier meeting from County employees Dobbert, Ott, and Zielinski.

It is also undisputed that the County enacted the BackDROP for its largest union, DC 48, in February 2001, *after* Mercer had performed a cost analysis of the BackDROP and *after* Mercer had delivered that analysis to that County in its January 16, 2001 letter to Dobbert.   This fact creates an insoluble problem of logic for the Plaintiffs' claim that they would have done something differently in October 2000 if they had known of the need for a cost analysis.  Put simply, *not* knowing the need for a cost analysis of the BackDROP in October 2000 cannot have caused its enactment, if  three months later the County enacted the same benefit  *after* it had learned the need for such an analysis and had, in fact, received one.

> **2.** **Even if there was actual reliance by the Plaintiffs on their misunderstanding of the Dobbert memorandum and Mercer's letter, that reliance was not justified.**

Even if, assuming for the sake of argument, the PSC members had reviewed the documents *and* had interpreted them as the Plaintiffs presume *and* had relied on Mercer's silence at the October 27, 2000 hearing as acquiescence to the proposition that Mercer had "costed out" the BackDROP and concluded its cost was "minimal" *and* had then relayed that misunderstanding to the County Board's Personnel Committee and the full County Board, the County would not have been justified in relying on that misunderstanding.   In *Carr v. Cigna Securities, Inc.*, the Seventh Circuit held that it is not reasonable for a party to rely upon oral statements made by another when the party has in its possession documents that state the truth in writing.[96]  In *Carr*, a professional athlete attempted to sue his financial advisors for allegedly misleading him about a risky investment strategy.  The athlete alleged that the defendants told

---

[96] 95 F.3d 544 (7th Cir. 1996).

him the investments were safe and conservative, but admitted that he had been given documents

that disclosed potential risks.  In holding that the athlete's claims were barred as a matter of law,

Judge Posner, writing for the Court, said:

> The claims are barred by a very simple, very basic, very sensible
> principle of the law of fraud… If a literate, competent adult is given
> a document that in readable and comprehensible prose says X (X
> might be, "this is a risky investment"), and the person who hands it
> to him tells him orally, not X ("this is a safe investment"), our
> literate competent adult cannot maintain an action for fraud against
> the issuer of the document.[97]

 In a similar case, *Associates in Adolescent Psychiatry, S.C. v. Home Life Insurance Co.*, the

Seventh Circuit upheld the dismissal of claims based on misrepresentations (wire and mail fraud)

because it held that no jury could find that the plaintiff, a reasonable investor, was misled by

statements allegedly made him when he possessed ample literature and documents that outlined

the specifics of the of the investment.[98]   "If ample opportunity existed to discover the truth, then

reliance is not justified."[99]

Here, as Dobbert himself has testified, "anyone who looked at the document and the

attachment would realize that seeing as there was no reference to the backDROP or the sick

leave in the Mercer document attached, would realize that the backDROP and sick leave

allotment had not been reviewed by Mercer."   Therefore, because the Plaintiffs had in their

possession documents that contradicted the alleged misrepresentations (by omission) made

during the October 27, 2000 meeting, their claims are barred as a matter of law under *Carr*  and

---

[97] *Id*. at 547;  *see also*, *Kaloti Enterprises, Inc. v. Kellogg Sales Co*., 699 N.W.2d 20 (Wis. 2005)(for purposes of a duty to disclose claim, "parties to a business transaction must use their faculties and exercise ordinary business sense, and not call on the law to stand in loco parentis to protect them in their ordinary dealings with other business people").

[98] 941 F.2d 561 , 570-71 (7th Cir. 1991); *see also, Wamser v. J.E. Liss, Inc.*, 838 F.Supp. 393 (E.D. Wis. 1993)(oral misrepresentations not material when the plaintiff possessed a document that contained a written statement of the truth);  *Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776 (7th Cir. 1991)(the plaintiff did not have a "legal cause of injury" against securities dealer who allegedly made statements about the risks of an investment that contradicted the written information the plaintiff possessed).

[99] *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir. 1988).

*Adolescent Psychiatry.*  Put differently, because County Board members had access to – even if they did not read them – documents that could have been interpreted *correctly* to read that Mercer had *not* "costed out" the BackDROP prior to the October 27, 2000 PSC hearing, Mercer had no duty to correct any misapprehension the PSC members under which they may have been operating.

Further, even if the Court were to disagree with Dobbert's interpretation of the documents as clearly saying that Mercer had *not* costed out the BackDROP, the fact remains that it is a reasonable interpretation that PSC members and County Supervisors could have adopted (again, had they read the documents).   Wisconsin has adopted the Restatement (Second) of Torts, § 551, which holds that a duty to disclose a fact rather than remain silent only arises where "the non-disclosing party *knew* that the other party was not aware of the fact" and "the mistaken party could not discover the fact by ordinary investigation or inspection, or he or she could not otherwise reasonably be expected to discover the fact."[100]   Here Mercer could *not* have known that the PSC members had misinterpreted the Dobbert memorandum and Mercer's attached letter (again assuming hypothetically that they had received them and reviewed them) to mean that Mercer had performed a cost analysis of the BackDROP and had concluded that it was "cost neutral."   Moreover, the PSC members could have easily discovered the contrary fact by "ordinary investigation," the simple expedient of asking Dobbert, Skelly or Soderstrom a question:   "These documents are unclear to us.   Did Mercer do a cost analysis of the BackDROP or not?"

---

[100] *Kaloti,* 699 N.W.2d at 213.

**3.**     **In any event, the County, through its representative, Dobbert, already knew that Mercer had not performed a cost analysis of the BackDROP, because Dobbert's knowledge must be imputed to the County as a matter of law.**

Plaintiffs' claims related to Mercer's supposed omission at the October 27, 2000 PSC hearing – Mercer's failure to tell them that Mercer had not performed a cost analysis of the BackDROP – are also barred for the simple reason that *Dobbert himself* knew that fact. Because Dobbert, the Director of Human Resources for the County knew that fact, his knowledge must be imputed to the County as his principal as a matter of law under basic principles of agency law.[101]   Those principles hold that "[w]hen an agent  has authority to deal in general with the subject matter of a transaction, knowledge that he or she gains in the course of the transaction is imputable to the principal."[102]   Mercer cannot be liable for not telling the County something that the County, through Dobbert, already knew.

Put differently, Plaintiffs cannot demonstrate justifiable reliance on Mercer's non-disclosure, if their own agent, Dobbert, could have told them himself that Mercer had not yet performed a cost analysis of the BackDROP.

In addition, it is undisputed that Dobbert was Mercer's contact person for its work on the pension benefit enhancements enacted in 2000 and 2001; the County clearly gave him the authority for that relationship.   Indeed, the County's contract with Mercer stipulates that the County is "represented by Gary J. Dobbert" and that "[n]otices to the County… shall be sufficient if sent [to] Gary J. Dobbert."  "Where an agent has authority to deal in general with the

---

[101] *See, e.g., Employers Ins. Of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937 (7th Cir. 2000)(applying Wisconsin law that an agent's knowledge is imputed to the principal); *Lakeshore Commercial Fin. Corp. v. Bradford Arms Corp.*, 173 N.W.2d 165, 172 (Wis. 1970)(under Wisconsin law, a principal is "bound and affected by such knowledge and notice as its agents received").   As noted above, it is also likely that others at the County, including Jac Amerell, the administrator of the ERS, should have known that Mercer had not performed a cost analysis of the BackDROP, since Mercer had told Amerell that it had no involvement with the BackDROP.
[102] *Ivers & Pond Piano Co. v. Peckham,* 139 N.W.2d 57 (Wis. 1966).

subject matter of a transaction, knowledge that he gains in the course of that transaction is imputable to the principal, and he is charged with the consequences of that knowledge."[103]

Mercer cannot be liable for failing to tell the County at the PSC hearing that Mercer had not performed a cost analysis of the BackDROP, because the County, through Dobbert, already knew that fact.

### C. Mercer Is Not Liable To The County For Allegedly Underestimating The Cost Of The Backdrop In Its January 16, 2001 Letter, Because The County's Decisionmakers Never Received Mercer's January 16, 2001 Letter, Or The Information Contained Therein, And Thus Could Not Have Relied On It.

Mercer is also not liable to the Plaintiffs for allegedly underestimating the cost of the BackDROP in its January 16, 2001 letter to Dobbert, because the Plaintiffs have not produced any evidence of their actual reliance on the letter. As shown above, it is undisputed that the ultimate County decisionmakers – the County Board – never saw Mercer's letter. Indeed, both Ament, the County Executive, and DeBruin, the head of the Personnel Committee in 2000 and 2001, have testified that they never saw the letter prior to the County's enactment of the Package for the County's largest union, DC 48, on February 15, 2001. Heer, the head of the Department of Audit, further testified that he has no evidence that County supervisors had *ever* received the cost information in the January 16, 2001 letter. Indeed, this was a key conclusion of his Department's April 2002 Audit.

Nor, critically, did Dobbert revise the "fiscal note" accompanying the resolution enacting the Package to reflect the BackDROP's cost as calculated by Mercer. Again, it is undisputed that the fiscal note used when the Package was passed by the County Board for the County's largest union, DC 48, in February 2001, was *not* revised to include the cost of $718,000 per year attributed to the BackDROP by Mercer in its January 16, 2001 letter to Dobbert. Since, by law,

---

[103] *Id.*

every ordinance submitted to the Milwaukee County Board of Supervisors for enactment must be accompanied by a "fiscal note" addressing the financial implications of the proposal, the failure by Dobbert to include the BackDROP's costs as calculated by Mercer in its January 16, 2001 letter means that the County decisionmakers did not have that cost before them and could not have relied on it. Indeed, as shown above, County Supervisors routinely look to the fiscal note for information on the financial implications of a particular ordinance and rely on the fiscal note in making their decisions. Supervisors have specifically testified that they did so with regard to the Package. As Borkowski put it, "[a]s far as county government is concerned, my costing out is the fiscal note… For me, the fiscal note on the resolution is what salted my vote."

### D. Soderstrom's Statements Regarding The ERS' Future Investment Returns Cannot Form The Basis Of Liability As A "Virtual Guarantee."

Soderstrom's statements projecting future investment returns for the ERS of 12-13% as "appropriate for planning purposes" in his June 8, 2000 letter to Dobbert and his extemporaneous comments at the October 27, 2000 hearing cannot form the basis of liability as a "virtual guarantee."

First, there is no evidence that County decisionmakers relied on the statements as "guarantees" in enacting the Package. As to the June 8, 2000 letter, there is no evidence that Dobbert or Ament passed on the letter to the County Board. And neither Ament nor Dobbert have testified that they viewed the letter as a "guarantee." To the contrary, Ament testified that guarantee was a "strange word" to use to describe Mercer's advice; and Dobbert testified that he understood Mercer's caveat that "interim volatility is… almost a certainty." Other County Supervisors like Mayo and Borkowski have similarly testified that they understood that "ups and downs in the market" were inevitable and that actuaries "don't have a crystal ball."

As to the comments before the PSC, there is no evidence that they were ever passed on to the County Board either.   Of the three Supervisors who heard the comments at the PSC – Krug, DeBruin and Borkowski – two voted *against* the pension enhancements that were part of the Package, including the BackDROP.   There is no evidence whatsoever that anyone who did hear the comments understood them at the time as a "guarantee."   Indeed, in the transcript of the PSC hearing itself, Krug noted that "if you get a flat market like you are describing in the 70's or 60's, then you have to take your losses"; and Kenner, one of the appointed members of the PSC, commented that "[i]t is highly unlikely, somewhat unrealistic, that we will never have to increase the tax levy as far as pension contribution is concerned."[104]

Second, even if the County decisionmakers had somehow relied on Soderstrom's statements as a guarantee, such reliance would have been unjustifiable  as a matter of law given Mercer's numerous caveats.   As shown above, Soderstrom's June 8, 2000 letter expressly qualified its conclusions by the caveat that "past performance is *not* a guarantee of future results."   And, in the PSC hearing, both Soderstrom and Skelly offered numerous additional cautionary comments that render any reliance by the County on a "guarantee" of 12-13% unjustified:

- Skelly:   "investment return is the key variable," but "in the short term it is not possible to predict."

- Soderstrom:   "there is nothing we can do to guarantee that you will not have a contribution."

- Soderstrom:   "you may have, and you will have, periodic blips that come through on your radar screen and there is limited amounts that I can do to prevent them."

---

[104] In a prior litigation, *Bilda et al.  v. Milwaukee County et al.,* 722 N.W.2d 116, 128 (Wis.App. 2006), the Wisconsin Court of Appeals, in the course of affirming a decision granting summary judgment motions brought by the County and the ERS, noted that "Skelly and Soderstrom told the commission members that whether additional County contributions would be required would depend on the rate of investment return."

- Soderstrom: "I have training and qualification, but I would say I cannot do that [project investment returns over the next two years]. I am not an attorney and not an investment advisor. I am very good at running liability numbers, but as far as projecting on assets…."

As noted above, under Wisconsin law "parties to a business transaction must use their faculties and exercise ordinary business sense, and not call on the law to stand in loco parentis to protect them in their ordinary dealings with other business people."[105] Similarly, in *Adolescent Psychiatry,* the Seventh Circuit dismissed an action when it determined that no person of ordinary prudence would have relied on the challenged statements about the yield of a particular annuity as "gospel statements."[106]

There is no plausible basis for the County to claim that it somehow reasonably relied on Soderstrom's comments as a "gospel statement" guaranteeing that the ERS would earn 12-13% indefinitely, particularly where documents throughout their files reveal communications and contracts with the ERS' investment managers that repeatedly state that "past performance does not guarantee future results, which will vary." Although the question of justifiable reliance is ordinarily a question of fact, it can be decided on summary judgment if no reasonable jury could find that the plaintiff's reliance on the defendant's statements was justifiable.[107] Under all of the circumstances here, it would have been patently unreasonable for County Supervisors to rely on a single comment in a letter from Mercer or extemporaneous comments in the PSC hearing as a promise that Mercer would somehow become the guarantor of the ERS' investment returns until 2036.

---

[105] *Kalotis,* 699 N.W.2d 20.

[106] 941 F.2d at 570.

[107] *Teamsters Local 282,* 839 F.2d at 370 ("in order to avoid summary judgment, [plaintiff] must set forth enough facts from which a jury could find by clear and convincing evidence that it was justified in relying on the defendant's alleged misrepresentation"); *see also, Novell*, 2008 WL 2185987 at ¶ 61 ("there are cases in which a circuit court may determine as a matter of law that a plaintiff's belief of a defendant's representation is unreasonable, and as a result the plaintiff's reliance is therefore also unreasonable").

There are other purely legal reasons why the County's claim that Soderstrom's comments constituted a "virtual guarantee" of 12-13% investment returns for the ERS going forward indefinitely must fail.   To be actionable as a misrepresentation, Soderstrom's comments must have been a statement of *fact*.   Statements of fact must relate to present or preexisting facts, not something to occur in the future.[108]   But Soderstrom's five-year projections were hedged predictions about the future of a market he described as "volatile."   Moreover, to be actionable as misrepresentations, the statements must have been *untrue*.   But the ERS' five-year average investment return as of the summer and fall of 2000 was actually in excess of 13%, as Soderstrom's June 8, 2000 letter reported.   And, as shown above, the ERS' five-year average investment return for 2003-2008 is over 12%.   The only problem with Soderstrom's prediction in 2000 was the fact that the stock market was on the verge of its worst three-year period since the Great Depression, something that no one could have predicted.

## III.   THE ERS AND THE PENSION BOARD ARE NOT PROPER PARTIES TO THIS ACTION.

Finally, Mercer has moved the Court for summary judgment dismissing the ERS and the Pension Board as Plaintiffs.   The ERS and the Pension Board are not proper parties to this action for two simple reasons:   (1) they were not involved at all in the enactment of the BackDROP, did not receive any of Mercer's advice on the BackDROP, and took no action in reliance on any advice; and (2) they were not harmed by the enactment of the BackDROP in any way.

Indeed, as the ERS has contended in prior litigation, the ERS and the Pension Board have no statutory role in the enactment of new benefits and instead are tasked only with administering

---

[108] *See United States Oil Co. v. Midwest Auto Care Services, Inc.*, 440 N.W.2d 825, 827 (Wis. Ct. App. 1989); *see also, Badger Pharmacal v. Colgate-Palmolive Co.*, 1 F.3d 621, 627 (7th Cir. 1993)(unfulfilled promise or statement of future events cannot provide the basis of a misrepresentation claim).

those benefits the County Board has chosen to enact.   The ERS thus itself prevailed in that prior litigation by arguing that it was not a proper party to an action by a class of County employees who had not received the BackDROP alleging that the enactment of the BackDROP constituted an unconstitutional taking, precisely because the ERS had played no role in the enactment.

 "Judicial estoppel provides that when a party prevails on one legal or factual ground in a lawsuit, that party cannot later repudiate that ground in subsequent litigation based on the underlying facts."[109]  The ERS and the Pension Board should be estopped from claiming that they are proper parties in an action involving the enactment of the BackDROP when they have previously argued and prevailed in court contending the opposite.

Moreover, it is undisputed that the County is obligated to contribute whatever is necessary to fund the ERS' payment of promised pension benefits to County retirees.   Because the ERS is assured sufficient contributions from the County to support any and all benefit obligations, the ERS cannot have been harmed by the enactment of the BackDROP.   Not surprisingly, *all* of the damages claimed by Plaintiffs relate to the supposed necessity for increased contributions from the County to pay for the BackDROP.   It is also undisputed that "[a]t no time has any ERS participant failed to receive all benefits for which he/she is or was eligible… all benefits have been paid timely and in full, and there is no likelihood that will change in the foreseeable future."   As Lee Holloway, the Chair of the County Board, has confirmed, "[n]o one that's involved in the pension, as far as I know, has been harmed."

## CONCLUSION

Mercer's motion addresses a narrow, but essential question – whether anyone at the County actually and justifiably relied on Mercer's advice in enacting the BackDROP in 2000 and 2001.   As shown above, there is no evidence demonstrating that any County Board members

---

[109] *Urbania v. Cent. States, S.E. and S. W. Areas Pension Fund,* 421 F.3d 580, 589 (7th Cir.2005).

relied on Mercer's advice, much less a majority.   Instead, the Plaintiffs' case is an after-the-fact

fabrication in an attempt to scapegoat Mercer and to shift blame away from the mistakes of

County personnel like Dobbert and the County Board's own lack of oversight in connection with

the enactment of the 2001-2004 Wage and Benefit Package.

For the foregoing reasons, summary judgment should be granted to Mercer dismissing

the Complaint.


**s/ Eric J. Van Vugt**
Paul D. Bauer
Joshua D. Maggard
Valerie P. Vidal
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI  53202-4497
(414) 277-5625
ejv@quarles.com

*Attorneys for Mercer Human Resource*
*Consulting, Inc.*