UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MILWAUKEE COUNTY, et al.,

        Plaintiffs,

v.

                                  Case No. 06-CV-0372

MERCER HUMAN RESOURCE
CONSULTING, INC.,

        Defendant.

## REPLY BRIEF IN SUPPORT OF MERCER'S MOTION FOR SUMMARY JUDGMENT

Mercer's summary judgment motion was narrowly focused on a discrete issue that would dispose of all of the claims brought by the Plaintiffs, Milwaukee County, its Employees' Retirement System, and the Pension Board (collectively, "the County"):

> **Is there any admissible evidence in the record showing that County decision-makers actually relied on *specific* advice from Mercer in enacting the "BackDROP" pension benefit?**

As Mercer's motion demonstrated, with regard to each specific instance when the County says it relied on Mercer, the undisputed facts show that it did not. The County's response does not create a genuine issue of material fact with regard to any of these specific instances. Nor does it offer any persuasive legal grounds why the absence of reliance should not bar all of its claims.

In particular, the County cannot explain why the knowledge of its former Human Resources Director, Gary Dobbert ("Dobbert") – that Mercer had *not* been hired to analyze the BackDROP's cost as of the October 27, 2000 Pension Study Commission ("PSC") hearing – should not be imputed to the County. If it is, the predicate for the County's claims falls apart.

Instead of rebutting Mercer's arguments regarding the County's specific allegations of

reliance, the County's response is a calculated exercise in obfuscation. First, the County brings a motion to strike much of Mercer's evidence, including prior depositions, statements by County witnesses to criminal investigators highly critical of County personnel, and even the County's own damning April 2002 audit of its procedures that led to the enactment of the BackDROP.[1] Next, the County submits "sham affidavits" from Supervisors and PSC members, claiming reliance on Mercer, but *directly contradicting their own earlier deposition testimony*.[2]

Most transparently, the County spends much of its brief, not addressing reliance at all, but instead raising numerous issues that are simply not germane to Mercer's motion:

- The County highlights its "experts" opinions about standard of care and Mercer's supposed negligence. The County never mentions the 2002 report of a nationally-respected actuarial firm it had hired to examine Mercer's work, Milliman USA, which found that Mercer's actuarial assumptions and methods were reasonable.

- The County emphasizes the supposed "damages" it has suffered. The County never mentions that its largest damage figures depend on the absurd notion that Mercer should somehow pay *every dime* of the County's contributions to the ERS *for thirty years*, even for benefits enacted long before 2001.

- The County refers several times in its response to the canard that the BackDROP "caused" early retirements. The County never mentions that its own experts have calculated that BackDROP recipients actually were significantly *older* on average when they retired than non-BackDROP retirees.

- The County creates an amorphous "history" of reliance on Mercer for BackDROP advice, supposedly dating to 1997. But until the late summer of 2000 Dobbert himself believed the BackDROP was a "dead issue." And, when the BackDROP was finally inserted into labor negotiations in September 2000, Dobbert asked the Reinhart law firm, not Mercer, to look for "red flags."

- Finally, the County frequently resorts to scare rhetoric that its fiscal house has suffered a "disaster" or "catastrophe" because of the BackDROP. But the County's wage and pension costs are *less* today as a percentage of its budget than they were in 2000, before the BackDROP. If there is a financial "crisis" at the County apart from political hype, it hasn't been caused by the BackDROP.

---

[1] Mercer responds to this ill-conceived motion in its response brief, filed concurrently with this Reply.
[2] As Mercer argues in its own Motion to Strike, these sham affidavits must be stricken as a matter of law.

*None of these topics is relevant*, however, to Mercer's focus on reliance, and Mercer will not further address them here.[3] Because the County's response spends so much energy on irrelevant issues, Mercer's reply will address only a few points.[4]

## ARGUMENT

I.  THE COUNTY FAILS TO CREATE A GENUINE ISSUE OF MATERIAL FACT REGARDING THE LACK OF RELIANCE ON SPECIFIC MERCER ADVICE.

   A.  No Admissible Evidence Exists Showing That PSC Members Relied On A Misreading Of Dobbert's October 25, 2000 Memorandum.

As Mercer has explained, the County's claims largely depend on the following sequence of allegations related to the October 27, 2000 PSC hearing:

(1) The three PSC members who voted for the BackDROP Derek Kenner, Mark Borkowski, and James McClutchy, all received *and read* Dobbert's October 25, 2000 memorandum containing the following statements:

> The establishment of the "back drop" benefit and sick allowance pay out have minimal impact on the pension system. The actuary has reviewed the cost of these benefit revisions and has provided the attached letter.

(2) The same three PSC members all *misinterpreted* the Dobbert memorandum as affirmatively stating that Mercer had analyzed the cost of the BackDROP and concluded that the cost was "minimal."

(3) The same three PSC members all voted for the pension package including the BackDROP in reliance on that *specific* misinterpretation and Mercer's failure to correct their misunderstanding.

(4) All of these three PSC members who voted "yes" would have changed their votes to "no" had they known Mercer had not analyzed the BackDROP's cost, *i.e.*, had they learned facts correcting their supposed misinterpretation of the Dobbert memorandum.[5]

Thus, Kenner, Borkowski and McClutchy must be shown by admissible evidence to have

---

[3] For the sole purpose of protecting the record, Mercer will respond to these allegations as necessary in its responses to Plaintiffs' Proposed Findings of Fact.
[4] Notably, Mercer will *not* discuss the County's weak opposition to Mercer's position that the ERS and Pension Board are not proper parties, and stands on the arguments on this issue presented in its opening brief.
[5] *See* Plaintiffs' Response to Mercer's Motion for Summary Judgment ("Response"), p. 2; *see also,* Affidavit of Derek Kenner ("Kenner Aff."), ¶ 14; Affidavit of James McClutchy ("McClutchy Aff."), ¶ 7; Affidavit of Mark Borkowski ("Borkowski Aff."), ¶ 6.

read Dobbert's October 25, 2000 memorandum, to have misinterpreted it in the precise manner the County alleges, and to have relied on that misinformation in casting their vote. If, in fact, they did not actually read and misinterpret the Dobbert memorandum in that way, they could not have relied on Mercer's "silence," and there is no reliance by the County.

There are unbridgeable gaps in the "evidence" the County presents on this issue.

First, there is no admissible evidence that Kenner ever read the Dobbert letter, much less misinterpreted it in the way the County alleges. To be sure, his affidavit affirms generically that he "received and reviewed" a packet of information regarding the pension aspects of the Package by the time of the meeting, a packet he now says included the letter.[6] But in his March 12, 2003 sworn deposition in the *Bilda* case, Kenner testified that he had *not* received the letter before the hearing, and could not be sure that he received it at the hearing.[7]

More importantly, in the same deposition, Kenner testified as follows:

> Q. At the time of the meeting did you understand what that backdrop meant or what that entailed?
> A. No.
> Q. Okay.
> A. Not at all.
> Q. Was it even discussed at all during the meeting?
> A. I don't remember. I mean – And I say this because when it became a big hullabaloo, I thought back about that meeting, and I couldn't remember any discussion about it.[8]

In other words, far from testifying that he had read the Dobbert memorandum before his vote, interpreted it as saying that the BackDROP had a "minimal" cost, and voted "yes" in reliance on that misinterpretation, Kenner testified that he didn't even know what a BackDROP *was* during the PSC meeting, and couldn't recall *any* discussion about it. Kenner's affidavit is thus a classic "sham affidavit," in which an affiant attempts to create an issue of material fact by contradicting

---

[6] *See* Kenner Aff., ¶ 10.
[7] *See* Declaration of Paul D. Bauer, June 9, 2008 ("Bauer Decl."), Exh. 46, pp. 19-20.
[8] *Id*., p. 25.

his own prior sworn testimony.

Ironically, Kenner's non-existent "reliance" evidence is the County's strongest. By contrast, Borkowski, the one County Supervisor on the PSC who voted for the BackDROP, does not state in his affidavit that he "reviewed" the packet of information containing the Dobbert memorandum, but only states that he "received" the packet, a fact he only knows now because the transcript of the hearing says so.[9] However, Borkowski admitted in his August 7, 2003 *Bilda* deposition that he could not recall seeing the memorandum, but claimed that he certainly *would* have recalled ever seeing the $7.6 million cost Mercer attributed to the pension portion of the pension package even without the BackDROP, as shown in its October 3, 2000 letter, which was attached to Dobbert's memorandum; and that, had he even seen *that* information, it would have changed his vote.[10] There is thus no evidence that Borkowski relied on a misinterpretation of the Dobbert memorandum in casting his vote. Again, to the degree that Borkowski's affidavit now says the opposite, that affidavit is a "sham affidavit," and must be disregarded.

Finally, McClutchy's affidavit does not state that he even "received" the Dobbert memorandum prior to his vote, much less that he "reviewed" it or that he misinterpreted it the way the County alleges.[11] Meanwhile, in his April 2, 2003 *Bilda* deposition McClutchy was quite clear in admitting that he could not recall *ever* seeing the memorandum.[12]

To summarize: from the outset of this litigation, the County has alleged that PSC members acted in reliance on a misunderstanding that Mercer had analyzed the cost of the BackDROP based *specifically* on the ambiguous statement in Dobbert's October 25, 2000

---

[9] *See* Borkowski Aff., ¶ 4.
[10] *See* Mercer's Proposed Findings of Fact ("DPFOF") ¶¶ 83-84.
[11] *See* McClutchy Aff., *passim.*
[12] *See* Supplemental Declaration of Paul D. Bauer, August 11, 2008 ("Bauer Decl. II"), Exh. 72, pp. 17-19.

memorandum, a misunderstanding that Mercer supposedly should have corrected.[13] In their

response to Mercer's motion, the County effectively "doubles down" on this allegation.[14] But

the allegation is false. Since the County asserts that the BackDROP would have been "dead in

the water" absent that misunderstanding, the County's claims fail on this ground alone.

> **B.  No Admissible Evidence Exists Showing That County Decision-Makers Relied On Mercer's January 16, 2001 Cost Estimate for the BackDROP.**

As Mercer has argued, there is no admissible evidence whatsoever that any decision-

makers at the County ever saw Mercer's January 16, 2001 letter to Dobbert, in which Mercer

presents its analysis of the cost of the BackDROP, estimating an initial annual cost for the

benefit of $718,000 escalating every year for 35 years. Having not seen the advice, they could

not have relied on it.

The County's response is remarkably weak. The County asserts that former County

Board chair Karen Ordinans and former County Executive Tom Ament "relied" on the January

16, 2001 Mercer letter. But Ordinans only testified that "there was a good *likelihood*" that she

saw the letter before voting on the pension package in February 2001 for AFSCME District

Council 48 ("DC 48"), the County's largest union. And Ordinans only believed this fact

"because of the date," after being shown the letter by her lawyer.[15] Her "reliance" on Mercer's

letter is thus pure speculation, not admissible evidence.[16] Meanwhile, the County merely asserts

that Ament "may or may not have seen" the letter prior to the vote for DC 48.[17] Again, Ament's

speculation is simply not admissible evidence. And Ordinans' and Ament's deposition

---

[13] *See* Complaint, ¶¶ 32-33.
[14] *See, e.g.*, Response, p. 2 ("The County would have pulled the plug at any decision making point if Mercer had warned . . . that it hadn't studied the costs.").
[15] *See* PPFOF 146, *citing* McNeil Decl., ¶ 9, Ex. H, Deposition of Karen Ordinans, p. 97. Ordinans clarified two pages later that "I cannot be sure that I read this before the vote." *Id.*, pp. 98-99.
[16] *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)( "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").
[17] *See* PPFOF 147, *citing* McNeil Decl., ¶ 2, Ex. A, Deposition of Thomas Ament, pp. 58-59.

testimony is the *only* evidence the County has on this point.

Moreover, the County admits that "Dobbert did not revise the fiscal note attached to the resolution for the Package when it was passed by the County Board for the County's largest union, DC 48, in February 2001 to include the cost of $718,000 per year attributed to the BackDROP by Mercer in its January 16, 2001 letter to Dobbert."[18] This now admitted fact is important because fiscal notes are required by law to accompany every ordinance that comes before the County Board; the purpose of a "fiscal note," as codified by the County's own Administrative Manual, is to allow the County Board "to see at a glance where the major fiscal changes will take place."[19] Because Dobbert did not include Mercer's cost estimate for the BackDROP in a revised fiscal note, County Supervisors who relied on the fiscal note did not know about – and thus could not have relied on – Mercer's cost estimate. Remarkably, the County's response *does not even mention* the fiscal note issue.

But the lack of reliance by the County on Mercer's annual cost estimate of $718,000 for the BackDROP in Mercer's January 16, 2001 letter is also important for another reason – it exposes an insoluble logical flaw in the County's case. The County's central claim focusing on the October 27, 2000 PSC hearing is that it would not have enacted the BackDROP if the PSC had known Mercer had *not* analyzed the cost of the benefit. But when Mercer did analyze the cost of the BackDROP in January 2001, at a time when the County had still not enacted the benefit for its largest union, the County *ignored* Mercer's analysis. Meanwhile, the County claims it enacted the BackDROP believing it was "cost-neutral." But, again, when the County enacted the BackDROP for its largest union in February 2001 it *ignored* Mercer's analysis showing that it had a substantial annual cost of $718,000, escalating every year for thirty-five

---

[18] *See* Plaintiffs' Responses to Mercer's Proposed Findings of Fact ("Responses to DPFOF"), ¶ 117.
[19] *See* Bauer Decl. II, Exh. 73, at § 1.10; s*ee also,* Responses to DPFOF, ¶ 107.

years – at a minimum a long-term cost of at least $25 million. That is hardly "minimal."

### C. No Admissible Evidence Exists Showing That The County Relied On A "Guarantee" From Mercer Regarding The ERS' Investment Returns.

In its Complaint, the County also alleged that it enacted the BackDROP in reliance on comments in the PSC hearing by Mercer actuary Glenn Soderstrom that the County claims constituted a "virtual guarantee" that the ERS would earn 12-13% investment returns indefinitely.[20] Based entirely on this "virtual guarantee," the County has constructed its two most extreme "damage models." In the first, the County asserts that it should not have to make *any* contributions into the ERS until 2036 (35 years from 2001), and claims $900 million in damages.[21] In the second, the County asserts that it should never have to pay more than $20 million in any given year until 2036, and claims more than $600 million in damages.[22]

As Mercer has argued, there is no evidence in the record that any of the ultimate County decision-makers relied on this "guarantee" from Mercer. Moreover, the claim is defeated by simply reviewing the full context of Soderstrom's comments, in which he clearly cautions the County that market volatility and economic uncertainty are inevitable. Indeed, Soderstrom expressly told the County that Mercer could *not* "guarantee" future investment results. Thus, any reliance by the County on Soderstrom's statements was unjustifiable as a matter of law.

The County effectively abandons this "virtual guarantee" claim in their response to Mercer's motion. The County's response brief does not mention the "virtual guarantee" at all, nor do any of the affidavits of County witnesses. No one at the County apparently wants to swear in an affidavit that they were quite so naïve as to believe that Mercer had "guaranteed" the ERS' investment returns literally *forever*, and had promised to make up any shortfall, no matter

---

[20] *See* Complaint, ¶¶ 14(c), 68(c), 72(g).
[21] *See* Affidavit of Gene Kalwarski, ¶ 5, Exhibit A, p. 13.
[22] *Id.*

how great.  The claim, in short, was pure fantasy – a concoction designed for the sole purpose of generating the largest possible damage models.

Because the County offers no evidence that anyone at the County actually believed that Mercer had "guaranteed" the ERS's investment returns and promised to make up the shortfall, the Court should at a minimum enter partial summary judgment for Mercer establishing as facts not genuinely at issue the lack of the County's reliance on Mercer's "virtual guarantee" and precluding the damage models that flow from that supposed guarantee.[23]

## II. DOBBERT'S KNOWLEDGE THAT MERCER HAD NOT ANALYZED THE BACKDROP'S COSTS AS OF THE OCTOBER 27, 2000 PSC MEETING MUST BE IMPUTED TO THE COUNTY.

The role of Dobbert in the enactment of the BackDROP and his subsequent criminal conviction are core facts that the County wishes would disappear.  From the outset the County has claimed that the BackDROP would have been "dead in the water" had the PSC only known that Mercer had not yet analyzed its cost.  But Dobbert knew that fact.  As Mercer has argued, an agent's knowledge is imputed to his principal, so in this case Dobbert's knowledge must be imputed to the County.  If Dobbert's knowledge that Mercer had not analyzed the BackDROP's cost as of October 27, 2000 is imputed to the County, this case should be over.

In response, the County first asserts that the question of whether Dobbert was the County's agent is somehow at issue.  But Dobbert was the County's Director of Human Resources and Mercer's contract with the County identifies him as the County's representative. The same contract stated that notice to the County from Mercer – *i.e.*, information Mercer might need to transmit to the County in the course of the engagement – would be effective if sent to

---

[23] *See* Fed.R.Civ.P. Rule 56(d)(1)("If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue…. It should then issue an order specifying what facts – *including items of damages or other relief* – are not genuinely at issue.  The facts so specified must be treated as established in the action.")(emphasis added).

Dobbert. There can be no serious dispute that Dobbert was the County's agent.

Second, the County offers the seemingly glib point that there are "disputed issues of fact as to what Mr. Dobbert knew and when he knew it."[24] But there is only *one* fact that matters as to what Dobbert knew and when he knew it – whether Mercer had, in fact, analyzed the cost of the BackDROP as of the October 27, 2000 PSC hearing. Dobbert admits that he knew it.[25]

Third, and most bizarrely, the County attempts to create an issue of fact regarding imputation by claiming that it is disputed whether Mr. Dobbert's acts were within the scope of his employment relationship with the County, and whether his actions related to the BackDROP were *"ultra vires"* because they were criminal. Although not stated plainly, the County is essentially arguing that it *might* have an argument against imputation under the so-called "adverse agent" exception, under which an agent's knowledge is not imputed to his principal if the agent is acting *solely* for his own benefit rather than for the benefit of the principal.[26]

There are insoluble factual, legal, and logical problems with this argument.

As to the facts: the County *denied* Mercers' Proposed Finding of Fact ¶ 4 stating that Dobbert had been convicted of a felony and two misdemeanors.[27] And, throughout the litigation, County witnesses have taken the position that Dobbert acted *innocently*.[28] Moreover, in its own Proposed Findings of Fact, the County presents *no* evidence supporting the notion that Dobbert was acting beyond the scope of his authority, much less that he was acting *solely* in his own

---

[24] *See* Response, pp. 42-43.
[25] *See* Mercer's Proposed Findings of Fact, ¶ 77, which cites Dobbert's *very clear* deposition testimony on this issue. The County's denial in its response to Mercer's PFOF is not supported by any fair reading of this evidence.
[26] *See First Nat'l Bank of Cicero v. Lewco Sec. Corp.* 860 F.2d 1407, 1417 (7th Cir. 1989)(adverse agency exception holds that if an agent's interests are shown to be *completely* adverse to those of the principal, the agent's knowledge and/or actions are not imputed to the principal).
[27] *See* Responses to DPFOF, ¶ 4.
[28] *See* Bauer Decl. II, Exh. 74, pp. 93-94 (Q: "Have you learned anything since August 2003 that has taught you that . . . Dobbert did not deliberately lie to you?" A: "I believe I've learned additional information that would make me question that, yes, sir."); Bauer Decl. II, Exh. 75, p.59 ("I believe that at – that Mr. Dobbert thought that what he was presenting at that time was accurate.").

interest. There is thus no evidence to support the County's argument that Dobbert's knowledge at the October 27, 2000 PSC hearing should not be imputed to the County.

The County also presents no legal basis for the proposition that a plaintiff can avoid imputation by claiming that its own agent for the transaction at issue was a criminal. The only case the County cites is completely inapposite, standing only for the proposition that the agent himself cannot recover his attorney fees from his principal under an indemnification ordinance for an unsuccessful defense against charges of public corruption.[29] Meanwhile, there is abundant case law holding that the adverse agent exception is not available where the agent at issue was the principal's "sole representative" for the transaction in question, as Dobbert certainly was here.[30]

On the one hand, the question that should be asked the County is: which is it? Was Dobbert innocent or a criminal? The County cannot create an issue of fact by never telling the Court which one of the two scenarios the County believes to be true.

On the other hand, the answer does not matter. If Dobbert acted innocently, then his knowledge about whether Mercer had analyzed the BackDROP's cost must be imputed to the County, and Mercer is entitled to summary judgment. But, if Dobbert acted criminally, even if his knowledge is not imputed – a legal conclusion Mercer does not concede – his actions would be a superseding cause of the County's enactment of the BackDROP, unless it was shown that Mercer knew that Dobbert, a lifelong civil servant with no criminal record, would be *likely* to commit a crime.[31] The County can produce no evidence showing that Mercer had any reason to

---

[29] *See Wright v. City of Danville*, 675 N.E.2d 110 (Ill. 1996), *cited in* Response, p. 44.
[30] *See, e.g., First Nat'l Bank of Cicero,* 860 F.2d at 1417 *(*"Where an adverse agent is also the sole representative of the principal in the transaction in question, the principal may once again be charged with the agent's knowledge." ).
[31] Wisconsin has adopted the Restatement (Second) of Torts, § 448, under which "[t]he act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that

suspect that Dobbert would commit the crimes for which he was convicted. Under those circumstances, summary judgment would also be appropriate.[32] Nothing in the County's response solves this logical dead-end into which the County has painted itself.

Finally, the County attempts to draw a specious comparison between imputation of Dobbert's knowledge to the County in the context of the October 27, 2000 PSC hearing and the lack of imputation of Dobbert's knowledge regarding Mercer's January 16, 2001 letter's cost estimate for the BackDROP, claiming that Mercer wants to "have its cake and eat it too." Again, the County substitutes glibness for logical legal analysis. In the first context, imputation of Dobbert's knowledge proves that any reliance by the PSC on Mercer's "silence," even if true, would not have been *justified*. In other words, imputing Dobbert's knowledge to the County only comes into play once *actual reliance is assumed.* Mercer's point was simply that, even if it were demonstrated that PSC members actually had been operating under the mistaken belief that Mercer had analyzed the BackDROP's cost, the County still could not prevail, because the truth was known to the County through Dobbert. In the second context, by contrast, the County wants to use imputation *to create actual reliance where none exists*, arguing that Dobbert's knowledge of Mercer's January 16, 2001 cost estimate should be imputed to all of the County's elected officials as a way of avoiding the fact that Dobbert did not pass on the information to them. The two instances are simply apples and oranges.

Dobbert's knowledge at the October 27, 2000 PSC hearing that Mercer had not yet analyzed the BackDROP's cost must be imputed to the County. Mercer cannot be liable for not telling the County something it already knew.

---

such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." *See Tobias v. County of Racine*, 179 Wis.2d 155, 162-163, 507 N.W.2d 340 (Ct.App.1993).
[32] *See Merz v. Old Republic Ins. Co.*, 53 Wis.2d 47, 57, 191 N.W.2d 876 (1971)(determination of whether a second act is a superseding cause is a question of law).

## III. ABSENT PROOF OF RELIANCE, ALL OF THE COUNTY'S CLAIMS FAIL.

The only "legal" argument the County offers is that reliance is not an element of breach of contract or professional negligence, and that those two claims should therefore survive even if the County is unable to show reliance. The County's argument misunderstands Mercer's position, is incorrect on the law, and does not pass the threshold test of common sense.

Mercer freely acknowledged that reliance is not typically an element of a breach of contract claim. Instead, Mercer argued that the causation element necessary to recover for breach of contract *in this case* necessarily requires reliance because, absent reliance on Mercer's advice, Mercer's alleged breach could not have caused the County to enact the BackDROP.[33]

This is not at all an eccentric concept, as the County would have the Court believe. Reliance and causation are often intermingled as concepts by courts, particularly in cases where the issue is whether a defendant's *advice* or other communications of *information* supposedly caused a plaintiff to enter into a transaction.[34] The thrust of such cases is that, where claims involve defendants being sued for the truth or "reliability" of information they provided to plaintiffs, the element of causation can *only* be shown by proof of reliance.

Mercer also argued that "justifiable reliance" had been adopted as a requirement for proving professional negligence related to "information… supplied for the guidance of others" via Wisconsin's adoption of the Restatement (Second) of Torts, § 552. This is clearly the

---

[33] Notably, in its Complaint, the County did not allege any independent, "contract-specific" cause of its alleged contract injuries, but instead simply incorporated by reference the factual allegations supporting its tort claims. *See* Complaint, ¶ 87. Thus, while the County now contends that "contract causation" and "tort reliance" are different concepts, their own Complaint treats them as identical.

[34] For instance, in the context of securities fraud actions, courts routinely describe "transaction causation" as "similar to reliance" in that it requires a showing that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the… transaction." *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005). Similarly, courts deciding false advertising cases brought under California's unfair competition laws "often use the terms 'causation' and 'reliance' together or interchangeably." *See Hall v. Time Inc.,* 158 Cal.App.4th 847, 70 Cal.Rptr.3d 466 (Cal.App. 2008). Again, in an accounting malpractice case brought under New York law alleging causes of action sounding in both contract and tort, causation requires "that the violations in question caused party to engage in the transaction in question" and "has been analogized to reliance." *See In re CBI Holding Co., Inc.***,** 247 B.R. 341 (Bkrtcy.S.D.N.Y. 2000).

standard in a Wisconsin case involving an actuarial consultant as defendant. Again, in cases like this involving professional *advice,* reliance is the only way a plaintiff can show the causation element of a malpractice claim.

In response, the County first cites a series of legal malpractice cases that utterly miss the point. These cases all involve the rule that, to prove causation in a legal malpractice case, the plaintiff has to prove that he would have prevailed in the "suit-within-the-suit."[35] But these cases all *assume* actual reliance – the client actually went into court with the attorney, who tried his case negligently and lost. Because the question of whether there was actual reliance on Mercer by the County's decision-makers in enacting the BackDROP is precisely what this motion challenges, these cases have no application here.

The County next badly misreads *Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis.2d 376 (1983) as applying the reliance requirement of the Restatement (Second) of Torts, § 552 *only* to third-party claims against professionals where privity is lacking, claiming that "[t]he case does not hold that the professional's first-party client has the same burden."[36] There is literally no support in the opinion for this conclusion. Fairly read, the case simply *assumes as a given* that § 552 would apply to first-party claims. In fact, Wisconsin courts have frequently applied § 552 to first-party claims for professional negligence against service providers sued by their clients based on allegedly negligent advice.[37] Indeed, the case the County next cites for a different proposition, *Hatleburg v. Northwest Bank Wisconsin,* 283 Wis.2d 234 (Wis. 2005), applies § 552 to a first-party claim by a settlor against a trustee.

---

[35] *See, e.g., Helmbrecht v. St. Paul Ins. Co.*, 122 Wis.2d 94, 103, 362 N.W.2d 118, 124 (1985).
[36] *See* Response, p. 36.
[37] *See, e.g., Milwaukee Partners v. Collins Engineers, Inc.*, 169 Wis.2d 355, 485 N.W.2d 274 (Wis.App. 1992)(claim by first-party client of engineering consultant).

The proposition for which the County does cite *Hatleburg* is apparently that the Restatement (Second) of Torts, § 552 somehow does not require that plaintiffs prove reliance on a professional's advice when suing the professional for negligence, but instead simply imposes a generic duty of truthfulness on professionals in general. This is frankly a perverse misreading. *Hatleburg* clearly stands for the proposition that § 552 as adopted by Wisconsin requires proof of the element of reliance in professional negligence cases:

> Wells Fargo made false statements to Erickson… Wells Fargo made the statements in the course of its business. Wells Fargo intended to guide Erickson's business practices… Wells Fargo had a pecuniary interest in the transactions… *Erickson relied on Wells Fargo's statements* and suffered pecuniary loss… Accordingly, Wells Fargo had – and breached – a duty under § 552.[38]

Finally, the County's argument does not pass the test of basic common sense. The County admits that causation is an element of breach of contract or professional negligence causes of action under any scenario. It meanwhile contends that reliance is *not* an element. But the County nowhere explains how, under the circumstances of this case, any piece of advice from Mercer could have caused the County any injury if no County decision-makers relied on the advice. As Mercer has contended throughout this litigation, if no County decision-makers received, read, and acted upon Mercer's advice, that advice could not have caused anything. In response, the County's argument is pure semantics.

Dated this 11th day of August, 2008.

**s/ Eric J. Van Vugt**
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202-4497
(414) 277-5625
ejv@quarles.com

*Attorneys for Mercer Human Resource Consulting, Inc.*

---

[38] *See Hatleburg*, 234 Wis. 2d at 255 (emphasis added).