# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MILWAUKEE COUNTY, et al.,

        Plaintiffs,

        vs.                Case No. 2:06-CV-00372-CNC

MERCER HUMAN RESOURCE
CONSULTING, INC.,

        Defendant.

---

Video Deposition of JOHN W. PEAVY III
Thursday, March 13th, 2008

9:58 a.m.

at

QUARLES & BRADY
411 East Wisconsin Avenue, Suite 2040
Milwaukee, Wisconsin

Reported by Sarah A. Hart, RPR/RMR/CRR

1           JOHN W. PEAVY III, called as a witness
2   herein, having been first duly sworn on oath, was
3   examined and testified as follows:
4                   EXAMINATION
5 BY MR. MCNEIL:
6 Q   Mr. Peavy, could you state your name for the record.
7 A   John W. Peavy III.
8 Q   Will you look at Exhibit 431 in front of you and
9     identify whether this is your expert report in this
10    lawsuit for the defendants -- for the defendant.
11 A   This appears to be my report with the exhibits
12     attached.
13 Q   Let me ask you, sir -- when did you -- when were you
14     first contacted to be an expert in this case?
15 A   Would have been the summer of 2007.
16 Q   All right. And do you recall exactly when -- when in
17     the summer?
18 A   No.
19 Q   Okay. Let me show you what's been marked as
20     plaintiffs' Exhibit 4 -- 432.
21        (Exhibit 432 marked for identification.)
22 BY MR. MCNEIL:
23 Q   It's a calendar of the -- kind of the last 14 months
24     or so. Could you take a look at that calendar and
25     see if that zeros you in any more on when it would

```
1          case like -- like US Airways?
2     A    It's not --
3              MR. BAUER:  Object to the form.
4              THE WITNESS:  That's not something that I
5          can -- I mean, 'cause I can't opine on what legal
6          standards are.
7     BY MR. MCNEIL:
8     Q    Okay.
9     A    I can only standard -- opine on was this prudent to
10         do what they did from an investment standpoint, from
11         a professional standpoint as one who's been involved
12         in the industry for over 35 years.
13    Q    Okay.
14    A    It doesn't make sense to me that they would be
15         imprudent.  And I would be testifying they're prudent
16         in the first place.
17    Q    That's what I -- my question is this, as a follow-up
18         to that:  What kind of standards of prudent behavior
19         apply in one of these defined contribution situations
20         as opposed to a pension fund?  Just start with a
21         defined contribution.  What standards apply?  Where
22         do you find them?  Are they listed somewhere?
23    A    Well, I'm sure the legal standards are.  I'll not
24         respond to that.
25              But the professional standards, that's
```

```
 1    why I'm here.  I'm not sure that they're listed
 2    anywhere.  There's certainly books, numerous
 3    publications on what are the fiduciary duties of
 4    trustees.  So I suppose that would contain a volume.
 5    But I don't think there's, frankly, such a thing as a
 6    list of the standards, because they vary from case to
 7    case for professional standards.
 8  Q Well, it's nice to have a rule book, and I'm asking
 9    if you -- if you can point us to any rule books over
10    there in this defined contribution area that -- that
11    you could point to to say the folks you rep -- you
12    testified for acted prudently.
13  A I do not go by a rule book.  Like I say, there's a
14    number of publications, all of -- well, some of which
15    I have read and studied.  But I am unaware of a rule
16    book that lists 1 through X exactly what were the
17    rules of professional conduct.
18  Q Have you --
19  A The CFA Institute provides many of those rules,
20    and -- but -- but those are lists that begin the
21    rules.  There's standards beyond that.
22  Q Yeah.
23  A Like I say, every case you would have to look at
24    separately on a defined contribution plan, as I have.
25    Every one of these cases that I've participated in
```

|   |   |   |
|---|---|---|
| 1 |   | had different -- different situations, and therefore, |
| 2 |   | what might be relevant to one wasn't necessarily |
| 3 |   | relevant to the other. |
| 4 | Q | Have you ever written a paper -- I know you attached |
| 5 |   | your resume -- a paper on this issue of what is |
| 6 |   | prudent behavior in the defined contribution area? |
| 7 | A | No. That hasn't been the focus of my published |
| 8 |   | research. I'm a empirical researcher. So that |
| 9 |   | wouldn't have been something I would ever -- |
| 10 | Q | So you've never published in that area? |
| 11 | A | No, it's not something that I've published in. It's |
| 12 |   | what I've practiced for over 30 years, but not |
| 13 |   | published. |
| 14 | Q | Now, let me ask you this: You're not saying, are |
| 15 |   | you, that the standards that apply to a defined |
| 16 |   | contribution plan in terms of prudent investment, |
| 17 |   | prudent investment, is -- are the same as the -- as |
| 18 |   | standards that should apply to a county pension board |
| 19 |   | like Milwaukee County in determining whether to adopt |
| 20 |   | a new ben -- pension benefit -- set of pension |
| 21 |   | benefit changes? Those are different standards, |
| 22 |   | aren't they? |
| 23 | A | Different investment standards? |
| 24 | Q | No, just different standards. |
| 25 | A | Well, you just said different investment standards. |

BY MR. MCNEIL:

Q   Can I -- can I ask you -- I'm -- I'm not saying they're from any document. I'm asking you if you agree with this. If you -- if I gave you the test, what's -- what's your answer? Do you see this statement, "Do you believe that the Pension Study Commission satisfied the narrow requirements of what it was supposed to do in advising the County Board"?

         MR. BAUER: Again, also object that you're asking him, again, for a legal conclusion.

         MR. MCNEIL: I'm not asking anything. I'm asking what his -- his personal opinion is.

         MR. BAUER: I'm objecting that you're asking for a legal conclusion, because both of the two sheets --

         MR. MCNEIL: I'm asking --

         MR. BAUER: -- that you've presented to him talk about standards under Wisconsin law.

BY MR. MCNEIL:

Q   When I ask you that, that would be the starting place for your analysis, wouldn't it, sir, what Wisconsin --

A   Well, I am not holding myself out as a -- as a lawyer or an expert in Wisconsin law. But from a professional standard and from the way that markets

|   |   |   |
|---|---|---|
| 1 |   | work and the way that I've observed many pension |
| 2 |   | plans to work in the years that I've worked with |
| 3 |   | hundreds of them is that the -- I would disagree with |
| 4 |   | this -- with the statement, forgetting the law part. |
| 5 |   | But the -- but the -- |
| 6 | Q | I just want to know a yes or no answer. You just -- |
| 7 | A | Well, you're not going to get one, because you're |
| 8 |   | asking for a legal opinion. |
| 9 | Q | I'm not asking -- |
| 10 | A | I'll give you a professional opinion. |
| 11 | Q | I'm not asking you for any -- what I'm asking you for |
| 12 |   | is what is your opinion, your professional opinion, |
| 13 |   | you're expressing to this jury. Do you -- do you |
| 14 |   | agree or disagree with the statement on -- what's |
| 15 |   | that exhibit number, sir? |
| 16 | A | In my opinion, the Pension Study Commission did not |
| 17 |   | satisfy the requirements of -- of properly advising |
| 18 |   | the County Board about the cost implications of the |
| 19 |   | benefit changes. |
| 20 | Q | All right. |
| 21 | A | There was no mention whatsoever of the cost of the |
| 22 |   | backDROP benefit, for example. That on its own, not |
| 23 |   | to mention that they didn't provide the required |
| 24 |   | report that is required by Wisconsin law, is my |
| 25 |   | understanding -- or by County law ordinance. |

```
 1  A    If they -- if they -- if they just said it right to
 2       me like that, I don't know.  I've never been in that
 3       situation.  I probably would speak up.
 4  Q    Okay.
 5  A    But if it was -- if it was anything that had to do
 6       with an ambiguity, I -- you know, like I say, you
 7       don't have to speak up there, but you would have
 8       to -- if you can -- if you can speak up -- I mean,
 9       the point is, if you can speak up in time for
10       whatever the issue is to be corrected, if there's a
11       correction needed -- and I'm trying to think in that
12       situation, because that's really what happened in
13       that Dallas case, is that there was -- there were,
14       for lack of a better term, I could call dueling
15       actuaries, one of which had different opinions than
16       mine.  And -- and I think there was some challenges.
17                      And I remember going to -- like the
18       very next day going to the -- oh, what was his name?
19       The city manager, John Ware, and saying, I don't
20       think these are right; we need to fix them.  And
21       so -- so there was some of that in that -- in that
22       very case, because there was a lot of controversy
23       about that case.
24  Q    Let me ask you this:  I'm going to -- I've seen your
25       report here --
```

| | | |
|---|---|---|
| 1 | A | By the way, excuse me for interrupting, but you asked |
| 2 | | and I didn't get a complete answer to the -- to those |
| 3 | | that I've worked for public -- for pension plans. |
| 4 | Q | Yeah. |
| 5 | A | I did testify in federal tax court in Washington D.C. |
| 6 | | over actuarial assumptions for a corporate pension |
| 7 | | plan. And so, you know, just to be -- a case on |
| 8 | | that. That was at the federal tax court in |
| 9 | | Washington. This would have been approximately more |
| 10 | | than 15 years ago. |
| 11 | Q | That was when you represented Goldman Sachs, right, |
| 12 | | you were retained on behalf of -- was it Goldman |
| 13 | | Sachs? |
| 14 | A | No, actually it was one of your local firms, Vinson & |
| 15 | | Elkins. |
| 16 | Q | Oh, the tax case with Vinson & Elkins? |
| 17 | A | Yes, sir. |
| 18 | Q | You were defending Vinson & Elkins in a tax case |
| 19 | | before the -- before the tax court? |
| 20 | A | Right, I was defending their actuarial assumption. |
| 21 | Q | But the actuarial assumption that you testified on |
| 22 | | was -- first of all, you're not an actuary, right? |
| 23 | A | Oh, that's right. |
| 24 | Q | You've not ever been trained in actuarial science, |
| 25 | | correct? |

1  A  No, I've been trained not in actuarial science.
2     Certainly areas that are similar and overlap with it,
3     like retirement plans.
4  Q  But you have never held yourself out as performing
5     actuarial services, correct?
6  A  Correct.
7  Q  And you really are not a -- an expert on the
8     standards that apply to actuaries, correct?
9  A  I do not hold myself out as an expert in those
10    standards.
11 Q  And in this case, you -- you have no opinion; you
12    were not even asked to give an opinion on whether the
13    actuaries in this case, the Milwaukee County case,
14    acted properly under the actuarial standards and
15    practice, correct?
16 A  I have not offered that opinion, yes.
17 Q  So you're not telling the jury one way or another
18    whether Mercer acted improperly in this case,
19    correct?  You're just talking about the County right
20    now?
21 A  I'm not testifying with respect to did they meet
22    actuarial standards, because I'm not -- but I am
23    testifying from 20 years of experience working
24    closely with both public and private pension plans
25    what I see as reasonable behavior on behalf of not

1       there is no assignment that you look at actuarial
2       behavior here. I don't see it. It's --
3 A   Well --
4 Q   Let me just quote it. It says, "I've been asked to
5       discuss the historical conduct of the County's
6       pattern of contributions and their relation to the
7       Employee Retirement System of the County of
8       Milwaukee's pension fund investment returns."
9       Do you see that?
10 A   I see that.
11 Q   That was the first opinion. And then you said, "I've
12       been" -- "also been asked to determine whether the
13       ERS and the County followed the appropriate
14       procedures and acted prudently when they approved the
15       2001 to 2004 wage and pension package." In -- do you
16       see that?
17 A   I see that, sure.
18 Q   And then you've been asked to respond to the
19       valuation role of the ERS and the County. Now, I
20       don't see any word about where you've been asked
21       to -- to provide expert opinions on whether the --
22       what the actuaries did were proper; is that correct?
23       Is it there? Is it there on the page? Does it say
24       it?
25 A   It's in the report.

```
1   Q    No, but is -- but does -- so you --
2   A    Yes.  The answer is yes, it's embedded in these
3        opinions.  For example --
4   Q    Okay.  I don't want more examples.  I want them all.
5        Okay?  And so we have this understanding that there's
6        no more for examples.  I want to know every one.  And
7        I don't want you to quit talking until you tell me
8        all of them, okay?
9   A    We have an understanding.
10  Q    All right, sir.
11  A    That's perfectly fine.
12  Q    Okay.
13  A    Paragraph 13, "County's contributions to the fund are
14       directly determined by the fund's level assets
15       compared to its liabilities."  That's what actuaries
16       do and so --
17  Q    Let me -- show me that right there.
18  A    Paragraph 13, first sentence.
19  Q    Now, are you --
20  A    So what --
21  Q    -- are you -- I see that.  What you're telling me is
22       your testimony is that actuaries determine those,
23       what the contributions are, correct?
24  A    Yes.
25  Q    Okay.  You have not made any independent study from
```

1  prudent for him to say that based upon what I've seen
2  over the last several years, many years, that a
3  12 percent rate of return in my opinion is
4  reasonable, having said that from the context I'm not
5  an investment professional.
6  BY MR. MCNEIL:
7  Q  And you're not an actuary either, are you, sir?
8  A  I'm an investment professional. I'm not an actuary.
9  Q  You're not an actuary. And can you quote for me the
10    standards that actuaries have -- have to use when
11    they make that kind of -- give that kind of advice?
12    Do you know what the standards are?
13  A  No, I do not know actuarial standards at all. I know
14    only my interaction with actuaries --
15  Q  Okay.
16  A  -- that -- how I would consider such a statement.
17  Q  So if -- if actuary standards prohibit that kind of
18    advice to a county, you -- you wouldn't -- you have
19    no opinion one way or another because you're not an
20    actuary, correct?
21  A  Well, I have a professional opinion, not from
22    actuarial standards, but yes, I do have an opinion.
23  Q  Well, I know you've got opinions. That's very clear
24    from this deposition. The question is whether you're
25    qualified to make the opinion. And I've just asked

```
 1        you a question.  Are you qualified as an actuary to
 2        tell me that -- that that statement by Mr. Soderstrom
 3        in June from an actuarial point of view was prudent?
 4        I think the answer is no, but is it yes or no?
 5   A    Well, the way you qualified that --
 6   Q    Is it yes or no?
 7   A    I mean, you put a qualifier there --
 8   Q    I sure --
 9   A    -- that says as an actuary.  I am not an actuary --
10   Q    Perfect.
11   A    -- but I am a person who is a trustee, I have been
12        advisors to trustees, I manage money for dozens of
13        pension plans.  I interact and I have seen hundreds
14        of actuarial presentations, and I certainly can opine
15        what I think is reasonable that an actuary would do
16        from a professional standpoint.  Not an actuarial
17        standard, but from a professional standard from
18        having observed actuaries for years.
19   Q    What is ASOP No. 4?  Have you ever read it, sir?
20   A    I just said --
21   Q    Well, I want to know.
22   A    No, I don't know what ASOP No. 4 is.
23   Q    What is ASOP No. 35, sir?
24   A    I will shortcut this.  I don't know any ASOPs, and
25        I've already testified to that.
```

1  Q    I know.  But it's unfair for you to say you haven't
2       read the standards that apply here and yet you're
3       going to have an opinion.  I mean, I have an opinion
4       on everything like you do, but it has to be qualified
5       as an expert --
6               MR. BAUER:  Object to the form --
7  BY MR. MCNEIL:
8  Q    -- correct?
9               MR. BAUER:  -- it assumes a legal -- as a
10      legal proposition that the only standards that are --
11      that are important in this case are the Actuarial
12      Standards of Practice, when there are common law
13      standards, and there are legal standards that apply
14      to government employees, to trustees, to everybody
15      else involved in this, including the County's
16      lawyers, et cetera.
17              MR. MCNEIL:  Mr. Bauer, Mr. Bauer, which
18      are the standards now that you're testifying?  What
19      are they?  Are you under oath now?
20              MR. BAUER:  I am not testifying.  I am
21      objecting to your question, which is misleading, Ken.
22              MR. MCNEIL:  Okay.  Thank you.
23 Q    Let's get back to this guess -- this testimony.  In
24      2000, in June of 2000, would you, given your
25      expertise, have told Milwaukee County that they could

|   |   |   |
|---|---|---|
| 1 |   | page -- we were talking about your opinions that |
| 2 |   | related to act -- whether Mercer's actuarial behavior |
| 3 |   | was proper.  And you pointed me to paragraph 13, you |
| 4 |   | pointed me to -- in paragraph 12 to Opinions D. |
| 5 |   | What's next? |
| 6 | A | Well, first, I mean, I'm not testifying that their |
| 7 |   | actuarial -- all of their actuarial duties were |
| 8 |   | proper or improper.  That's not my role. |
| 9 | Q | Okay. |
| 10 | A | So when you characterize that I'm saying actuarial, |
| 11 |   | I'm just saying based upon what I've seen that an |
| 12 |   | actuary would do and what I would expect an actuary |
| 13 |   | to do in those situations from my experience -- |
| 14 | Q | Okay.  Well -- |
| 15 | A | -- they acted reasonably.  And that is not on |
| 16 |   | calculations of funded amounts or those things. |
| 17 | Q | Okay.  Let me -- I want you to continue to point out |
| 18 |   | these places specifically so that I know every place |
| 19 |   | in this report where you're talking about from your |
| 20 |   | experience so that we'll later be able to judge |
| 21 |   | whether that's appropriate. |
| 22 | A | Well, throughout this whole report, at least in some |
| 23 |   | ways these touch on the actuarial duties. |
| 24 | Q | Well, I've got the rest of the afternoon.  Let's go. |
| 25 |   | Start on -- let's go -- |